# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

# DISTRICT OF TENNESSEE, AT GREENEVILLE:

**CHRISTINE BEARDEN, ET AL**

**VERSUS**                                    **CASE NO.: 2:19-CV-55-CLC-MCLC**

**BALLAD HEALTH, ET AL**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DOC. 27)

### A. Introduction

*"(A) Rose is a Rose is a Rose, is a Rose"*—**Stein, Gertrude, "Sacred Emily." (1913)**

*"When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck."*—**Riley, James Whitcomb**

Yes, in this Memorandum of Law, your plaintiffs shall speak of the wonders of nature. Before then, plaintiffs wish to opine about a pusillanimous, prevaricating, predator of the sea, the Octopus

An octopus is a rather solitary, predatory, bottom-feeding, spineless, cephalopod. It hides in dens buried in the ocean deep, and ventures out within a short range from its "hidey-hole" to wreak havoc upon its fellow ocean creatures. It can grow to tremendous size and seems awfully monstrous.

Yet, when the "bully of the seas" is confronted by a challenge to its territory, rather than hold its position and fight to an honorable conclusion, it slinks away back into its "hidey-hole," obfuscating the chase of those who wish to gain revenge on it for its dastardly deeds by squirting a putrid pool of purple ink. (see, e.g. **Wassilieff, M. and O'Shea, S.," Octopus and Squid, Feeding and Predation," te Ara—The Encyclopedia of New Zealand,** (3/2/2009); Mather, J.A., Anderson, R.C., Wood, J.B., Octopus: The Ocean's Intelligent Invertebrate (Timber Press, 2010).

Thus, like the octopus of the ocean deep, defendant, Ballad Health, slinks out from the crevice in which it hides and perpetrates gloom and doom upon its market area. Being the intelligent creature it is, The Ballad Octopus rains havoc over the inhabitants of its market area who, it assumes, are

1

dumb, uneducated, hillbillies. And, yes, it is very true that Ballad Health has done considerable damage since, it, this largest of octopuses, was created from the petri dish of a few so-called economic and business "leaders" in its market area.

The Ballad Octopus, however, is being confronted in a challenge by ten, brave, honorable, people, with no financial interest in the outcome of this litigation. Having been so confronted, Ballad Health now attempts to slink back into its hidey hole by firing its putrid pool of purple ink into the faces of these plaintiffs, who dare challenge its hegemony over the health care of the persons in this market area, to wit: its Motion to Dismiss. The following brief, in opposition to the well-written Memorandum authored by defendants' worthy counsel, will show that, this time, The Octopus cannot escape into its underground lair.

## B. Issues

Because the issues are voluminous and the law governing them is complex, leave is respectfully requested of the Court to go just a bit beyond its 25-page limit on Memoranda.

The defendants bring forth several issues for the Court's consideration. Plaintiffs re-state these issues as follows:

1. Is East Tennessee State University (ETSU) a corporation?
2. Is Medical Education Assistance Corporation (MEAC) a subsidiary of ETSU?
3. Are MEAC and Ballad Health competitors?
4. Did plaintiffs plead with sufficiency what constitutes the relevant market?
5. Did plaintiffs plead with specificity what the competitive services are between MEAC and Ballad?
6. Did plaintiffs specifically plead all financial requirements to invoke the interlocking directorates prohibition of the Clayton Act?
7. Do plaintiffs have Article III standing to bring this litigation?
8. Finally, if Issues 1 through 7 are favorable to plaintiffs, are defendants nevertheless immunized from any interlocking directorate prohibitions under the Clayton Act by the state action immunity doctrine?

Because the answer to all the issues, as re-stated above, are in favor of plaintiffs, this lawsuit, it is respectfully shown to the Court and adversary counsel, must continue.

In other words, this is where the plaintiffs, respectfully, show to this Honorable Court and worthy adversary counsel that ETSU, MEAC and Ballad Health, waddle and quack like the ducks they are.

2

**1. ETSU IS, IN FACT, A CORPORATION:** If not a corporation, *de jure*, ETSU is a corporation, *de facto*. Basic grounds for the corporation *de jure* argument are set forth at **TCA § 49-7-206,** which is part of the statute governing the Tennessee Higher Education Commission. This statute brought the University of Tennessee system and the so-called Regents institutions, including ETSU, under the joint control of the Tennessee Higher Education Commission, while allowing each to retain some individual autonomy. **(Tennessee Public Chapter 179, 1967).** The statute speaks of the University of Tennessee retaining its identity and status as a "legal entity, a body politic **AND CORPORATE**, and as one of the state's federal land-grant institutions." **TCA § 49-7-206 (a) (1).**

Now, lest defendants cry to the Court, "So what? That language only applies to the University of Tennessee," here is why this is not a comparison of apples and oranges.

One example is the non-profit corporation East Tennessee State University Foundation. Now, whether this is related to East Tennessee State University could be stated by the defendants to be a mere matter of conjecture, but it surely walks like a duck and quacks like a duck. Information about this entity comes from its website, listing its Board of Directors, its purpose (to raise money for ETSU) and also its existence as a corporation is verified, as shown by information from the Tennessee Department of State, all of which is attached and incorporated as **Collective Exhibit 1** to the Response to Defendants' Motion to Dismiss **(Doc. 37).**

Another telling example is the non-profit corporation, East Tennessee State University Research Foundation. The very website which it maintains sets forth the fact that this corporation was established with the knowledge, permission, and active assent of the Tennessee Board of Regents as a non-profit corporation. Certain website information and records pertaining to same from the Tennessee Department of State are attached and incorporated as **Collective Exhibit 2** to the response **(Doc. 37).**

If that is not enough, plaintiffs invite the Court's attention to **Exhibit 3** to their response to the defendants' Motion to Dismiss **(Doc. 37).** This exhibit is the Tennessee Secretary of State's website information for defendant, MEAC. The exhibit shows that MEAC was incorporated in 1978. This exhibit also shows that the corporation has the following assumed names: (a) University Physicians

3

Practice Group, **(b) ETSU Physicians and Associates and (c) ETSU Health**. By those actions (carrying those assumed names), both MEAC AND ETSU are estopped from stating they are not corporations.

All of these entities are divisions of East Tennessee State University (ETSU) controlled by the ETSU university board, to which the powers of the Board of Regents have devolved, as set forth at **TCA § 49-8-201. TCA § 49-8-203** sets forth broad powers of the Board of Regents that are, *ipso facto*, corporate in nature. It has been shown how such powers show a *de facto* corporation. As proof of a *de jure* corporation, one needs only to look to **TCA § 49-8-203 (4),** which says:

"The board of regents and each state university board has other powers, not otherwise prescribed by law, that are necessary to carry out this part, and it is the expressed legislative intent and purpose to vest similar and comparable responsibility and authority in each board as **is authorized for the board of trustees of the University of Tennessee**; provided, that in exercising any power to borrow money for any purpose, whether by the issuance of bonds or notes or by any other method, each board shall first secure the approval of the state school bond authority." **(Emphasis added)**

Since the University of Tennessee is a "body politic **AND CORPORATE**" **[TCA § 49-7-206 (a) (1)]**, and since the board of regents and the ETSU board has authority and responsibility comparable to that of the University of Tennessee, then ETSU is a corporation, i.e. a "duck."

To close this discussion, plaintiffs refer to **Exhibit 4** to their response to the defendants' Motion to Dismiss **(Doc. 37)**, Section 1 of the By-Laws of ETSU (which has now been proven, despite any Certificate of Corporate Interest filed to the contrary, to be MEAC's parent, granting the ETSU board full and plenary power over its organization, administration, and its constituent parts, such as MEAC.) This document, plaintiffs state, shows that ETSU is clearly a corporation.

**2. INDEED, MEAC IS A SUBSIDIARY OF ETSU, AND ITS BUSINESS MUST BE CONSIDERED, FOR CLAYTON ACT PURPOSES, ETSU'S BUSINESS:** "A rose is a rose is a rose is a rose," and, concomitantly, MEAC and ETSU both walk like ducks, quack like ducks....and, thus, they are ducks.

Although ETSU's primary identity is as an educational institution, it certainly does not preclude its participation as a competitor in healthcare services markets. In fact, one only has to look at the ETSU Mission Statement, which is set forth as **Exhibit 5** to plaintiff's response to defendant's motion

4

to dismiss (**Doc. 37—see online at https://www.etsu.edu/president/mission.php.**).  This mission

statement, approved on March 24, 2017 by the ETSU Board—a Board, by the way, on which defendants

Golden, Niswonger and Noland sit—says, in part:

"The university conducts a wide array of educational and research programs and clinical services, **including a comprehensive Academic Health Sciences Center." (Exhibit 5, Plaintiffs' Response, Emphasis Added).**

Further, again, plaintiffs refer the Court to **Exhibit 4** to their response **(Doc. 37)** which,

again, is Section 1 of the By-Laws of ETSU.  Again, if it has not gotten through, this section says, *in toto*:

"The Board of Trustees ('Board'), **which is the governing body of East Tennessee State University,** has the powers set forth in TCA § 49-8-203 et seq.  Consistent with state law, the Board shall have full and complete control over its organization and administration, **also over its constituent parts and its financial affairs.  All Trustees (except the non-voting student trustee) shall have a vote on matters coming before the Board, or before any committee thereof of which they are members.**

A.  The East Tennessee State University ("University") is a public university established by the laws of the State of Tennessee.  **The University is governed by its local governing Board** as established by TCA § 49-8-101.

**B. The board of the University is vested with the power and authority to govern the University and to exercise all powers and authority as set forth in TCA § 49-8-101 et seq and the laws of the State of Tennessee."**

--**ETSU Bylaws**, Section 1 (Emphasis Added)

Where the activity of a parent and its wholly owned subsidiary are coordinated, then both

the parent and the subsidiary must be viewed as a single enterprise for purposes of antitrust law.  This is

because a parent and its subsidiary have common objectives, guided not by two separate corporate

consciousnesses, but one.  "They are not unlike a multiple team of horses drawing a vehicle under the

control of a single driver," and with or without a formal "agreement" memorializing same, the subsidiary

acts for the benefit of the parent.  **Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 770,**

**104 S. Ct. 2731, 2741-42, 81 L. Ed. 2d 628 (1984).**

In this light, an interesting read for the Court would be the case of **Medical Education**

**Assistance Corporation, et al vs. Mehta, 19 S. W. 3d 803 (Tenn. App. 1999).**  The importance of this

case is that the Tennessee Court of Appeals has previously found that ETSU is a third-party beneficiary of

the services of the physicians and staff of MEAC, so much so that the Tennessee Court of Appeals

5

enforced, and, in fact, BROADENED, a rather onerous covenant not to compete executed by a MEAC/ETSU heart specialist.

If the above were not enough proof, **MEAC'S OWN CHARTER AND BYLAWS PROVE THIS VERY POINT**.  Reference is made to **Exhibit 5A** to plaintiff's response to defendant's motion to dismiss **(Doc. 37)**.  The Dean of ETSU's College of Medicine was MEAC's incorporator.  Its initial principal office was "ETSU".  MEAC's charter, bylaws and amendments are subject to agreement and approval by ETSU's governing body (upon which Ballad directors Noland, Niswonger and Golden sit).  Article XV of the MEAC Bylaws allows the governing body to dissolve MEAC on June 30 of any year.  Article XVII of the MEAC Bylaws states that any amendment to them must be approved by the President of ETSU, the Dean of ETSU's College of Medicine, and the Board of Regents (now the ETSU Board).  Further, Article IX of the MEAC Charter **PROHIBITS COMPETITION BETWEEN MEAC AND ETSU:**

"The corporation (MEAC) shall not be authorized to compete either directly or indirectly with any programs of East Tennessee State University and its College of Medicine, or for any funds or property, federal, state, or otherwise, to which the University or the College may have access, **IT BEING SPECIFICALLY INTENDED THAT THE CORPORATION IS FORMED TO SUPPORT AND COMPLIMENT EAST TENNESSEE STATE UNIVERSITY'S MEDICAL ACTIVITIES."**

The plaintiffs also include **Exhibit 5B** to their response to defendant's motion to dismiss **(Doc. 37),** being the unaudited statement of net position (financial report) for ETSU ending June 30, 2018, two (2) pages of a comprehensive 61 page document. The document shows that MEAC is incorporated into ETSU's financial statements, completely.

In **United States vs. Crocker National Corp.**, **656 F. 2d 428 (9th Cir. 1981),** it was said that whether the business of a subsidiary, for purposes of Clayton Act analysis, is to be attributed to a parent in determining if a parent competes with another corporation with which it is interlocked **TURNS UPON THE EXTENT OF THE CONTROL EXERCISED BY THE PARENT OVER THE SUBSIDIARY'S BUSINESS, AND IF THE PARENT SUBSTANTIALLY CONTROLS THE POLICIES OF THE SUBSIDIARY, IT MAY BE FAIRLY SAID THAT THE BUSINESS AND LOCATION OF THE PARENT ARE THAT OF THE SUBSIDIARY.  United States vs. Crocker**

6

**National Corp.,** 656 F. 2d at 450-51, citing <u>United States vs. Cleveland Trust Co.,</u> 392 F. Supp. 699, 712 (N.D. Ohio 1974), affd., 513 F. 2d 633 (6th Cir. 1975), and cited by <u>Nobody in Particular Presents, Inc., vs. Clear Channel Communications, Inc.,</u> 311 F. Supp. 1048, 1070 (D. Col. 2004)

It, thus, respectfully follows that (a) Golden, Niswonger and Noland, (b) are members of the ETSU board, (c) that even though Noland is the only a member of the specific MEAC board, (d) ETSU has the sole governing power over MEAC, as MEAC is a "constituent part" of ETSU, and (e) that not only Noland, but also Golden and Niswonger, are subject to being sued in their capacity as "directors" under an interlocking directorate theory, especially since it has previously been shown in this Memorandum (f) that ETSU is a corporation. Most respectfully, the Ballad defendants are, to use an old idiom, "talking out of both sides of their mouths." Well, as one-known local activist would say, the Ballad plaintiffs, "May be country, but they sure are not dumb."

### 3. MEAC (ETSU) AND BALLAD HEALTH ARE, IN FACT, COMPETITORS:

Most respectfully, the defendants have the unmitigated gall, the temerity, to tell this Honorable Court that they are not competitors with ETSU/MEAC. Well, as per a great catch phrase the outstanding comedian, Steve Martin, uses, "Well excuuuuuuuuuse me."

The Court's attention is drawn to **Exhibit 6** of plaintiffs' response to defendants' motion to dismiss **(Doc. 37)**. This document was defendant, Ballad's, **THIRD** response to the Tennessee Department of Health for competing practice data, forwarded by Ballad to the Department of Health after its first two responses, made on March 28 and April 22, 2016 (these are attached as **Collective Exhibit 7** to plaintiffs' response to defendants' motion to dismiss **Doc. 37**), were deemed defective by the Department of Health. On the third try, Ballad finally admitted it had competitors in the region. The Court's attention is drawn to the section of this document entitled "Exhibit 3." In that section, not only does Ballad list its competing physician groups but also lists the approximate number **AND THE MARKET AREA THAT DEFENDANTS CLAIM PLAINTIFFS FAILED TO PLEAD!** The complete list is set out, *verbatim* for the Court in **Exhibit 8** to plaintiffs' response to the defendants' motion to dismiss **(Doc. 37),** which is the portion of **Exhibit 6** that is "Exhibit 3, pages 2 and 3.")

7

This document shows that **ETSU PHYSICIANS AND ASSOCIATES (I.E. MEAC) IS ONE OF THE THREE TOP COMPETITORS OF BALLAD HEALTH, BY BALLAD HEALTH'S OWN ADMISSION!** The document shows that MEAC/ETSU, along with Holston Medical Group and Appalachian Emergency Physicians (is it speculative to assume that Ballad will gobble Appalachian Emergency Physicians and Holston Medical Group as they hire their own?) employ at least 100 or more physicians in competition with Ballad physicians. Moreover, while the service area of MEAC is defined by **BALLAD'S OWN DOCUMENT** as being Carter, Washington, Hancock, and Sullivan Counties in Tennessee, the footnote to this table reads as follows:

"Counties (of service of the competitors) are based on the locations identified by each practice's website. In some cases, these counties may only reflect the office address or billing address of the practice **WHICH DOES NOT ACCOUNT FOR OUTREACH AND/OR FACILITY CREDENTIALING. THIS IS PARTICULARLY TRUE FOR HOSPITAL-BASED PRACTICES."**(Emphasis Added)

Thus, Ballad's attempt to pull the wool over the eyes of a public it believes is too country, too stupid, and too gullible to keep from eating its pabulum has failed, for Ballad's own documents, submitted before the merger to the Tennessee Department of Health, identified MEAC, a subsidiary of ETSU (see factual argument above), **AS ONE OF ITS LARGEST COMPETITORS**. Absolutely *prima facie*, if not conclusively, this proves the fact that three members of Ballad's board sit on a competitor's board (ETSU is THE governing board for MEAC).

(As a side note before leaving the discussion of this issue, one wonders whether Ballad is affixing its buzzard-like grin upon areas outside northeast Tennessee, like Knox and Jefferson County, where it lists having "competitors," and whether it is ready to ravenously pounce upon the medical facilities in these areas like the buzzard swoops down upon the carcass of a dead cow.)

**4. PLAINTIFFS, IN THEIR COMPLAINT, ABSOLUTELY AND SUCCINTLY PLED WHAT IS THE RELEVANT, COMPETITIVE, GEOGRAPHIC MARKET AREA:** In Paragraph 6 to the premises of their Complaint, plaintiffs pled that "certain health care organizations that provide medical and allied health care services to a primary service area comprised of multiple counties in northeast Tennessee and southwest Virginia, and which also solicits patients from the states of North

8

Carolina and West Virginia and the Commonwealth of Kentucky came under one 'umbrella', so to speak, when the merger of Mountain States Health Alliance and Wellmont Health Systems was allowed by the Tennessee Department of Health…" (**Doc. 1, p. 3**)  In their Memorandum **(See Doc. 28, pp. 13-14),** defendants state that the plaintiffs' definition is nil or, at best, ambiguous, thus requiring dismissal of the Complaint.  Defendants cited four (4) cases in support of their position that plaintiffs failed to adequately plead the market area: **Robert F. Booth Trust vs. Crowley, 687 F. 3d 314 (7th Cir 2012); Re/Max International vs. Realty One, Inc., 173 F. 3d 995 (6th Cir 1999); American Bakeries Co. vs. Gourmet Bakers, Inc., 515 F. Supp. 977 (D. Md. 1981),** and **Kentucky Speedway, LLC vs. NASCAR, 588 F. 3d 908 (6th Cir. 2009).**  Most respectfully, defendants' trust in these decisions is misplaced, and here is why.

First, **Robert F. Booth Trust vs. Crowley** was a case in which the gravamen was not antitrust (although an interlocking directorate was alleged) but, rather, the settlement of a derivative action brought against Sears by some of its shareholders.  **Re/Max International, Inc. vs. Realty One, Inc.** had nothing to do with sufficiency of pleadings and motions to dismiss, although, in that antitrust case, a motion to dismiss was overruled at the trial level.  No, what the 6th Circuit did in that case was determine whether the trial court erred in granting summary judgment to the defendants on all but one, small claim (the 6th Circuit indeed found error and remanded the case, see **Re/Max International, 173 F. 3d 995 at 1025.)**

**American Bakeries** is also clearly irrelevant to our discussion.  This case pertained to a lawsuit by a plaintiff, which was a supplier of finished baked goods at retail to consumers **(American Bakeries Co. vs. Gourmet Bakers, Inc., 515 F. Supp. 977 at 978**), while the defendant was in the business of processing and manufacturing raw goods **USED BY BAKERS** (**American Bakeries Co. v. Gourmet Bakers, Inc., 515 F. Supp. 977 at 978-79**).  Obviously, since there are two different competing PRODUCTS, there could not, in that case, be an antitrust violation.

**Kentucky Speedway, LLC vs. NASCAR** although also irrelevant to the situation at hand, does give us some guidance as to what must be proven as to relevant markets.  A relevant market has both a geographic and product component.  The product component is assessed by the reasonable

9

interchangeability standard, analyzed by considering whether substitute products can perform the same function and/or by cross-elasticity, i.e. consumer sensitivity to price levels at which they select substitutes for the defendant's product or services. **Kentucky Speedway, LLC vs. NASCAR, 588 F. 3d 908, 916-17 (internal citations omitted).**

      **FRCP 8** only requires that a pleading that asserts a claim for relief state the following (a) the grounds for the court's jurisdiction, (b) a short and plain statement showing the claimant is entitled to the relief sought, and (c) a demand for the relief sought. **FRCP 8 (a).** Pleadings are required to be simple, concise and direct, and no technical form of pleading is required. **FRCP 8 (d) (1).** (But see **FRCP 10** as to how each pleading must be presented, and **FRCP 7** as to the types of pleadings allowed.) Defensive pleadings are required to be more specific **(see FRCP 8 (b) and (c)),** and **FRCP 9** contains requirements for pleading special matters in claims and defenses, such as fraud and lack of capacity, that are irrelevant to this discussion. Yet, most of all, pleadings must be construed to do justice. **FRCP 8 (e).**

      Even if plaintiffs' Complaint had been filed by a "jailhouse lawyer," this Court must construe the pleadings to do justice, by the mandate of **FRCP 8 (e).** And, as defendants admitted, when determining whether to grant a motion to dismiss, this Court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party (the plaintiff). **Cob Clearinghouse Corp. vs. Aetna Healthcare, Inc., 362 F. 3d 877, 880-81 (6th Cir 2004),** cited in defendant's Memorandum **(Doc. 28, p. 4).**

      Even under the more stringent pleading requirements of **Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007),** plaintiffs' complaint survives this motion. **Bell Atlantic** held that while detailed factual allegations are not required, the allegations of a Complaint must rise above the speculative level, and, even though the plausible allegations of a Complaint are taken as true, no legal inferences are assumed to be true by the Court. **Bell Atlantic v. Twombly, 550 U.S. 544, 555-57; 127 S.Ct. 1965-66.** This was reiterated two years later by **Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009),** a decision which also held that a pleading that offers labels and assertions, or—and this is important "naked assertions **DEVOID OF FURTHER FACTUAL**

**ENHANCEMENT**," must be dismissed.  **Ashcroft v. Iqbal, 556 U.S. 662 at 668, 129 S. Ct. 1937 at 1949**.

Yet **Ashcroft** also reveals how a court determines that a claim states a "plausible claim for relief."  It is "…a context specific task that requires the reviewing court to draw on its **judicial experience and common sense**." But even if the facts are well-pled, if they do not allow the court, in the use of its judicial experience and common sense to infer more than the mere possibility of misconduct, then the pleader is not entitled to relief.  **Ashcroft v. Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950.**

Plaintiffs' assertion that defendants' conduct is more than a mere possibility comes, in part, from **BALLAD HEALTH'S OWN PRE-MERGER RESPONSE TO THE TENNESSEE DEPARTMENT OF HEALTH!**  Remarkably, Ballad claims that plaintiffs did not define the geographic market area, but yet they know of their own market area, as shown on **Exhibit 8**.  At the very least, it includes, according to Ballad**,** Carter, Hancock, Sullivan, Hawkins, Washington, Knox (????-Knox is outside northeast Tennessee), Cocke, Hamblen and Jefferson (also outside northeast Tennessee) Counties in Tennessee.  The area—again, according to BALLAD'S OWN DOCUMENTS--includes Scott, Washington, Smyth, Tazewell, and Wythe Counties in Virginia, along with the independent Virginia cities of Norton and Wise.  This Court may take judicial notice, pursuant to **FRE 201 (b) (1)**, because it is "especially known within (this Honorable Court's) jurisdiction" that all the counties comprising the Northeastern Division of the United States District Court for the Eastern District of Tennessee, with the exception of Johnson County, are admitted by Ballad as being in its geographic market area.  The Court may also take such judicial notice that two of the counties listed by Ballad as being its service area in Tennessee—Jefferson and Knox—are in this Court's Northern Division.

Furthermore, the Court, by utilizing the "factual enhancements" set forth in the plaintiffs' response to this Motion, can obviously see that all the locations in Virginia are in southwest Virginia, and, thus, plaintiffs have shown the market area to be northeast Tennessee and southwest Virginia.  To solve the question as to whether the market "bleeds over" into portions of Kentucky, North Carolina and West Virginia, we once again turn to Ballad's own documents.  See **this Memorandum**, **at page 7**, in which its

listed areas of competition with the private practitioners only reflected the office or mailing addresses, and not the geographic area of service.

But Ballad, in its own documents, states that its market area stretches, generally, west to east, from the westernmost point of Knox County (Farragut), to the easternmost point of Wythe County (Max Meadows, VA), and north from Tazewell County, Virginia, southward to Jefferson County. Again, making factual enhancements based upon common sense as contemplated by **Ashcroft v. Iqbal (556 U.S. at 679, 129 S. Ct. at 1950),** the geographic area is well-defined.

As the Court is aware, estoppel arises when one is concluded and forbidden by law to speak against his own act or deed. **Black's Law Dictionary, 4th Ed. (West Pub., 1968).** Ballad, knowing its market area, may not assert that plaintiff's case be dismissed because it thinks plaintiffs should have listed every street on every corner in every town, city and state where it has an economic impact.

Or, to put it another way, the plaintiffs "Did not fall off the turnip truck yesterday."

### 5. PLAINTIFFS PLED THE COMPETITIVE SERVICES OFFERED BY

**BALLAD AND MEAC CLEARLY:** Most respectfully, this position by Ballad is ludicrous, at best. About what else did Ballad think the plaintiffs were speaking: competition in manufacturing sprockets? This is certainly not a case about an interlocking directorate between Spacely Sprockets and Cogswell Cogs. **[See Hanna, William and Barbera, Joseph: "The Jetsons" (ABC TV, 1962)]** Rather, the case *sub judice* is a case pertaining to directors of Ballad and MEAC/ETSU sitting on each other's Board of Directors, when each entity competes with the other in providing certain medical and associated services.

Defendants would, most respectfully, have this Court believe that because the plaintiffs did not particularize each and every medical field and sub-specialty field in which the entities compete, that, therefore, their Complaint is fatal, and must be tossed. The plaintiffs, in a short, plain, concise statement, however, pled the relevant service as follows:

"6. Plaintiffs aver that on or about January 31, 2018 **certain health care organizations that provide medical and allied health services** to a primary service area…when the merger of **Mountain States Health and Wellmont Health System** was allowed by the Tennessee Department of Health under the terms of a Certificate of Public Advantage."—**Doc. 1, p. 3.**

Now, Ballad Health, which knows that it and MEAC/ETSU compete in the health care business, wants to throw out plaintiffs' complaint on yet another technicality. Yet, to re-state the **Ashcroft v. Iqbal** doctrine: "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw **ON ITS OWN JUDICIAL EXPERIENCE AND COMMON SENSE**." **Ashcroft v. Iqbal,** 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 869 (2009),** quoting **Iqbal v. Hasty**, 490 F. 3d 143, 157-58 (2d Cir 2007).

Plaintiffs' counsel knows that defense counsel is certainly aware that this is not this Honorable Court's "first rodeo," and that it (the Court) did not "fall of the turnip truck yesterday." Yet, in digging through this record, it really seems as if the defendants themselves (again, not their counsel), most respectfully, believe that the Court somewhat lacks common sense. Thus, to put this argument to bed once and for all that the competitive services are not defined adequately by the Complaint, plaintiffs attach **Exhibit 9** to their response to defendants' motion to dismiss **(Doc. 37),** a list of all medical services and sub-services Ballad renders provided by Ballad's own website.

Due to the manner in which ETSU/MEAC's website is set, plaintiffs' counsel was unable to copy same and attach as an exhibit to the response to defendants' motion. However, as an officer of the Court, counsel represents that ETSU/MEAC's website (on its website, ETSU/MEAC is dubbed "Quillen ETSU Physicians") lists 8 medical services: heart, internal medicine, psychiatric care, OB/GYN, sports medicine, osteoporosis/geriatrics, surgery and pediatrics. (See https://www.etsuhealthcare.com/our-services.). The following sub-services are provided:

**HEART:** General cardiology, interventional cardiology, electrophysiology.

**INTERNAL MEDICINE:** General internal medicine, hematology, cardiology, dermatology, endocrinology, oncology, rheumatology, infectious diseases, gastroenterology

**PSYCHIATRIC CARE:** General psychiatry, adult psychiatry, individual/family therapy, child/adolescent psychiatry.

**OB/GYN:** General OB/GYN, FPMRS/Urogynecology, high risk obstetrics, maternal-fetal medicine, minimally-invasive gynecological surgery, fertility, GYN oncology

**SPORTS MEDICINE**: Orthopedic sports medicine, physical therapy

13

**OSTEOPOROSIS/GERIATRICS**:  The Osteoporosis Center

**SURGERY:** General surgery, ophthalmology, pediatric surgery, plastic/reconstructive surgery, podiatry, surgical oncology, hepatobiliary surgery, trauma/critical care, vascular surgery

**PEDIATRICS:** General pediatrics, adolescent medicine, pediatric cardiology, pediatric diabetes, pediatric endocrinology, pediatric hematology, pediatric oncology, pediatric hospital medicine, pediatric critical care, pediatric infectious diseases, NICU, pediatric nephrology, pediatric neurology, pediatric pulmonology and general pediatric surgery.

Of the 8 primary services ETSU/MEAC provides, Ballad, *prima facie,* provides at least 5 (Heart, Internal Medicine, OB/GYN, Surgery and Pediatrics).  Even though not specifically stated, Ballad also provides a sixth component—Sports Medicine—in that it performs orthopedic surgery and is likely to be competing directly with ETSU/MEAC in this regard.  Also, it may be said that, as the geriatric population is more likely to suffer from various maladies, Ballad, while not having a designated section of its practice called "Osteoporosis/Geriatrics," nevertheless treats these conditions each and every day.

On its main website, Ballad lists nothing about psychiatric services.  But, a Google search of Woodridge Hospital, the region's only psychiatric hospital, referred this writer to another Ballad Health website, attached as **Exhibit 10** to plaintiffs' response to defendants' motion to dismiss **(Doc. 37).**

When this Court uses its common sense and judicial experience as it is required to by **Ashcroft**, it may certainly see that, on its face, the Complaint shows a plausible claim as—as stated by **Kentucky Speedway v. NASCAR**—the services Ballad, on the one hand, and MEAC/ETSU, on the other hand, both render, are interchangeable, perform the same function, and are absolutely sensitive to the prices that the consuming public would pay for these services in the marketplace.  Therefore, defendants' argument that the plaintiffs did not adequately plead the competitive services is absolutely fallacious. [**See also, Brown Shoe Co. vs. United States, 370 U.S. 294, 325, 82 S. Ct. 1502, 1523, 8 L. Ed. 2d 510 (1962), which pertained to the merger of Kinney Shoes and "Buster Brown" shoes;** also see **"The Definition of Competitors Under Section 8 of the Clayton Act: The Emergence of Supply Side Competition Analysis," 41 Wash. & Lee L. Rev. 135 (1984).]**

**6. PLAINTIFFS MORE THAN ADEQUATELY PLED THE COMPARABLE REVENUES OF THE CORPORATIONS ON WHICH THE INTERLOCKING DIRECTORS SIT:**

14

This issue shall be disposed of without citation to law, which the Court already knows, and by merely stating, that, *prima facie*, plaintiffs adequately proved this element by attaching to their Complaint a collective exhibit consisting of the IRS Form 990s for tax year 2016 for ETSU/MEAC and for the two entities that merged into Ballad, Mountain States Health Alliance and Wellmont Health Systems. **(Doc. 1, Exh. B).**

Wellmont stated that its mission **(Line 1, Part I, 2016 Wellmont Form 990**) was to "(D) eliver superior health care with compassion." It listed its program service revenue alone for Tax Year 2016 (i.e. the "delivery of superior health care with compassion") as being $713,674.075.00.

Mountain States Health Alliance stated that its mission (**Line 1, Part I, 2016 MSHA Form 990)** was to "… (bring) loving care to health care"…that it existed"…to identify and respond to the health care needs of individuals and communities in our region and to assist them in attaining their highest level of health." It listed its program service revenue alone for Tax Year 2016 (i.e., for "bringing loving care to health care…" and "…assisting (patients) in attaining their highest level of health.") as $716,841,391.00.

ETSU/MEAC stated that its mission **(Line 1, Part I, 2016 MEAC Form 990, d/b/a ETSU Physicians and Associates, by the way**), was to "Serve the healthcare needs of our patients, offering a comprehensive range of healthcare services for people of all ages, __EDUCATE OUR STUDENTS AND RESIDENTS,__ and improve the overall health of people of this region." It listed its program service revenue alone for Tax Year 2016 as $43,227,215.00.

(Most respectfully, if ETSU is truly separate from MEAC, then why would one of its stated purposes on its Form 990 be to "__EDUCATE ITS STUDENTS AND RESIDENTS?"__ Plaintiffs assumed that there were no students to educate by MEAC, as they were in the Medical School. But, again, this is another case of the duck trying to pretend he is a swan.)

Thus the attachment to the Complaint clearly shows that the program revenues of each corporation are sufficiently pled in order to meet the requirements of the pleading rules, and set forth a

more than plausible claim that the corporations come under the ambit of the interlocking directorate prohibition, due to their program revenues being sufficient enough to trigger the statute.

**INTERREGNUM:** Briefly, plaintiffs have heretofore shown that the Court may, by utilizing its common sense, judicial experience, and by logically enhancing the facts of the Complaint, find the following: (1) that ETSU is a corporation, in fact and in law; (2) that MEAC is a wholly owned subsidiary of ETSU; (c) that MEAC/ETSU and Ballad Health are, indeed, competitors**,** and (d) that plaintiffs sufficiently pled (1) the antitrust market component, (2) the antitrust competitive services component, and (3) the financial qualifications to bring the entities under Article III jurisdiction. Now, plaintiffs shall show (a) that they are entitled to relief under Section 8 of the Clayton Act, having shown the interlocking directorates are, *per se,* antitrust violations; (b) that they have Article III standing to bring this suit; (c) that they have alleged injury in fact, which is traceable to the defendants and which may be remediated by the actions of this Honorable Court, and (d) that the state-action immunity doctrine does not bar action by this Court.

### 7. PLAINTIFFS ARE ENTITLED TO RELIEF UNDER SECTION 8 OF THE CLAYTON ACT: THEY HAVE STANDING TO BRING THE SUIT AND HAVE ALLEGED INJURY UNDER THE ACT:
Admittedly, due to the nature of the question before this Court, the parties have been more concerned with an examination of the trees in the forest, where the "roses" and "ducks" mentioned at the beginning of this Memorandum could bloom and play. Yet, when one steps back and considers the forest as a whole, it becomes clear what Congress' intent, as interpreted by the courts, was in passing the interlocking directorate statute **(Section 8 of the Clayton Act):**

While other Federal laws, including the Sherman Act, seek to deter anticompetitive harms caused by monopoly and trade restraint agreements **(Brown Shoe Co. v. United States, 370 U.S. at 317),** the ultimate purpose of the Clayton Act and its concomitant FTC statutes relate particularly to mergers. In fact, Section 7 of the Clayton Act **(15 USC § 18)** applies to mergers in any line of commerce where the effect of same is to substantially lessen competition or tend to create a monopoly, except where

exempt by statute. **Ruane, Kathleen: "Pre-Merger Review and Challenges Under the Clayton Act and the Federal Trade Commission Act," Congressional Research Service, 9/27/2017, p. 1.**

The "forest" in which the metaphorical roses and ducks of this Memorandum bloom and play (but not The Octopus), is described thusly, by Kathleen Ruane, a staff attorney for the Congressional Research Service:

"By prohibiting mergers that negatively affect competition, the Clayton and FTC Acts aim to ***preserve*** rather than enhance competition and to **PROTECT OVERALL MARKET COMPETITION** rather than individual competitors. Accordingly, mergers may injure market competitors but not violate antitrust laws. Moreover, because Section 7 of the Clayton Act and Section 5 of the FTC Act aim to ***prevent*** anticompetitive harms from occurring, **THEY LOOK TO THE LIKELIHOOD OF FUTURE HARM. TO VIOLATE THESE STATUTES, THEREFORE, THE TRANSACTION MUST BE LIKELY, RATHER THAN CERTAIN, TO HAVE AN ANTICOMPETITIVE EFFECT. "(Ruane, Kathleen, ibid., p. 2—italicized emphasis in original, other emphasis supplied)**

Thus in **United States vs. Von's Grocery, 384 U.S. 270, 86 S. Ct. 1478, 16 L. Ed. 2d 555 (1966),** the United States Supreme Court struck down the merger of the two largest grocery chains in the Los Angeles metropolitan area. The Supreme Court rejected the merging parties' argument that the Los Angeles market was competitive before the merger; rather, the Court, Justice Hugo Black writing, stated that the purpose of Section 7 of the Clayton Act required not only an appraisal of the immediate impact of the merger on the market, "…**but a prediction of its impact upon competitive conditions in the future**." **United States v. Von's Grocery, 384 U.S. 270 at 278, 86 S. Ct. 1478 at 1482.** Justice Black also wrote that it was Congress' intent that a market displaying both a continuous decline in small businesses and an increase in mergers "…would slowly but inevitably gravitate from a market of many small competitors to one dominated by one or a few giants, and competition would thereby be destroyed. **United States v. Von's Grocery, ibid.** See also, **United States vs. E. I. DuPont de Nemours & Co., 353 U.S. 586, 593, 77 S. Ct. 872, 876-77, 1 L. Ed. 2d 1057 (1957) [The first case decided by the Supreme Court regarding the application of the Clayton Act to vertical acquisitions, holding that even non-competitors are subject to Clayton Act proscriptions]**

Now, it is likely that defendants will counter with a line of cases, such as **United States vs. Baker Hughes, Inc.,** **908 F. 2d 981 (D. C. Cir. 1990)**, and **United States vs. Anthem, Inc.,** **855 F. 3d 345 (D. C. Cir. 2017),** which flow from the doctrine first enunciated by the Supreme Court in **United States vs. General Dynamics Corporation,** **415 U.S. 486, 498-504, 94 S. Ct. 1186, 1194-97, 39 L. Ed. 2d 530 (1974).**  Most respectfully, however, the **General Dynamics** doctrine is merely a burden of proof doctrine, the standard burden shifting analysis presented to a court or jury at trial, or to a court at a summary judgment motion hearing**.  IN OTHER WORDS, IT IS MERELY ENOUGH THAT CLAIMANTS IN A CLAYTON ACT CASE SHOW A POTENTIAL OF HARM, NOT ACTUAL HARM, EVEN AFTER General Dynamics**.

A good case in point is that which the 9th Circuit issued in **United States vs. Crocker National Corp.,** **656 F. 2d 428 (9th Cir. 1981), (**cited previously for guidance as to when the business of a subsidiary is to be attributed to a *de jure* or *de facto* parent, for purposes of Clayton Act analysis**.)** The Ninth Circuit wrote that interlocking arrangements between competing corporations threaten the basic purposes of the Sherman Act (as enforced by the Clayton Act) to preserve free and unfettered competition as a rule of trade, and, therefore, **THEY ARE ILLEGAL PER SE**.  **United States vs. Crocker National Bank,** **656 F. 2d at 437-40**; see also **Protectoseal Co. vs. Barancik,** **484 F.2d 585, 589 (7th Cir. 1973).** Moreover, the character of the interlocking directorate prohibition of the Clayton Act is **REMEDIAL** and, as such, it is to be construed **LIBERALLY**. See **United States vs. Crocker National Bank,** **656 F.2d at 440-41**.

The purpose of the Clayton Act's prohibition of interlocking directorates was to "nip in the bud" **[a phrase coined by Fife, Barney, "The Andy Griffith Show" (CBS Television, 1960-68)]** incipient antitrust violations by removing the opportunity or temptation for such violations.  **TRW, Inc. vs. FTC,** **647 F. 2d 942, 946-47 (9th Cir. 1981)**.  The interlocking directorates prohibition is plenary; thus, a corporation may be a competitor of another corporation even if only one of the corporations is able to meet consumer requests in the market ("Competition also consists of efforts to make a sale, even if neither succeeds in persuading the buyer to purchase." **TRW, Inc. v. FTC,** **647 F. 2d at 947-48. )** In fact,

18

the prohibition against interlocks, despite what defendants would tell this Court, is so strict that it has been held by the courts that Congress' intent in prohibiting director interlocks was to prohibit same without regard to the amount of commerce to be restrained. **TRW, Inc. vs. FTC**, 647 F. 2d at 948, **Cia. Petrolera Caribe, Inc. vs. ARCO Caribbean Inc.,** 754 F. 2d 404, 413 (1st Cir 1985); **United States vs. Crocker National Corp.,** 422 F. Supp at 703; **United States vs. Socony-Vacuum Oil** Co., 310 U. S. 150, 60 S. Ct. 811, 84 L. Ed. 1129 (1940); **United States vs. Sears-Roebuck & Co.,** 111 F. Supp. 614, 619-21 (S.D.N.Y. 1953).

In summary, Section 8 of the Clayton Act is a remedial statute which must be construed liberally. It is a statute which is preventative in nature. While proof of same requires some analysis, the decisions quoted above clearly show that claimants may make out a *prima facie* case for relief. Finally, the relief—unlike what defendants are attempting to tell the Court—attempts to ameliorate what can occur in the future, thus obviating the need for the plaintiffs in this case to prove actual, concrete , particularized, imminent harm at this particular point. While this may be an aberration of the first prong of the three-prong test of **Spokeo, Inc. vs. Robins,** 136 S. Ct. 1540, 1547-48, nevertheless, the "injury in fact" under the Clayton Act contemplated by **Spokeo,** which is "actual, concrete, particularized, *de facto*, actually existing" is the imminent, future threat of harm by violation of antitrust law, and not the actual harm at the moment. **Spokeo, ibid.; see also Clapper v. Amnesty International USA,** 568 U.S. 398, 409, 133 S. Ct. 1138, 1147, 185 L. Ed 2d 264 (2013). Plaintiffs have shown imminent, non-speculative, certain injury, which although not now occurring, has a high probability of occurring. **DaimlerChrysler Corp. v. Cumo,** 547 U.S. 332, ____, 126 S. Ct. 1854, _____, 164 L. Ed 2d 509 (2006); **Friends of the Earth, Inc., v**. **Laidlaw Environmental Services (TOC), Inc.,** 528 U.S. 167,190, 120 S. Ct. 693, 709 145 L. Ed. 2d 610 (2000); **Babbit v. Farm Workers,** 442 U.S. 289, 298, 99 S. Ct. 2301, 2308-9, 60 L. Ed. 2d 895 (1979). Plaintiffs respectfully aver that the Court should have no problem in finding that they have satisfied the two remaining prongs of **Spokeo:** They aver they have proven that the harm is fairly traceable to defendants' conduct in this matter, and that this court may provide redress judicially.

[As another side note, defendants state in their Memorandum **(Doc. 28, pp.11-12**) that the eight other individual defendants who do not serve on multiple boards should be dismissed. Plaintiffs counter that they should not be dismissed. The reason is beyond simple: because all 11 members of the Ballad board allowed 3 of their own members to be illegal, interlocking directors, each of the other 8 participated in the Section 8 violation, thus poisoning the whole Board. Thus, these 8 are not immune from Section 8 sanctions.]

A telling example of how plaintiffs will probably suffer harm (more than a mere possibility), and, in fact, may have already, as consumers of health care services in Ballad's market area, suffered such harm, is shown by **Collective Exhibit 11** to plaintiffs' response to defendants' motion to dismiss **(Doc. 37),** the Minutes of the ETSU Board of Trustees' meeting of November 10, 2017, and the Minutes of the Academic and Student Affairs Committees of the ETSU Board of Trustees of February 23, 2018.

In his opening remarks to the November 10, 2017 Trustee's meeting, defendant, Niswonger, the Chair of the Board, noted that there had been "considerable action among individuals in the room to ensure the realization of the merger." He speaks of how, supposedly, investments in residencies and research at ETSU will result from the merger, and, further, said that "…it is critical that the university review its existing structure to be sure it can reap the merger benefits." Niswonger further charged [i.e. "Imposed a burden, duty, obligation, or lien,'--**see Black's Law Dictionary, 4th ed. (West Publishing, 1979)]** ETSU President Brian Noland to present the trustees a staffing structure and operations that would need to be made to ensure success in the post-merger environment. (**Exhibit 11 to Doc. 37**, **ETSU Board of Trustees' Minutes**, 11/10/2017, p. 1)

Then, to further surrender ETSU and its subordinate agents, such as MEAC, to Ballad Health, much in the manner Marshal Petain surrendered France to Adolph Hitler, the ETSU Board's Academic Affairs Committee met on February 23, 2018. In those Committee Minutes under **Item X** a long discussion was had among Drs. Bert Bach, Bill Duncan, and Dennis Depew, defendant Niswonger, defendant Golden, and trustee Linda Latimer, whose husband is Chairman of the Board of Bank of

20

Tennessee, and who (her husband, Bill Greene, after whom ETSU's football stadium is named) was, along with defendant, Levine, the first two contributors to the petri dish which spawned The Octopus.

The complete text of Trustee Latimer's statement, as well as remarks of Messrs. Golden and Niswonger, as recorded by Mr. David Linville, Secretary of ETSU's Board, follows:

"Trustee Linda Latimer said ETSU has everything going for it to be a huge benefactor of the recent merger, noting that time is the only thing not on ETSU's side right now. She said Ballad Health has to give $175 million to research over the next 10 years but noted that other institutions are acting swiftly in hopes of getting some of those funds. She concurred that there is a need to hire someone who puts ETSU first in relation to the merger and also noted that three of the 11 Ballad Health board members are also on the ETSU Board of Trustees. She said the region needs real innovation, adding that the university has less than a year to create a presentation on five areas of research **AND IT IS UP TO ETSU TO BRING IDEAS THAT WILL MAKE BALLAD HEALTH MONEY.** She encouraged leadership to get 25 great ideas catalogued as soon as possible, pointing out that there is an extraordinarily short timeline. Trustee Golden noted that however fast the university thinks it is running on this, it is going too slow and needs to think deeply about changing the cadence.

Chair Niswonger referred to it as a three-legged stool with (1) real research doctors, (2) the academics piece and (3) a commercialization officer that can bring corporate dollars in. **SEVERAL TRUSTEES ALSO NOTED THE SIGNIFICANCE OF HIRING THE RIGHT PERSON FOR THE NEW MEAC CEO POSITION** [n.b.—Didn't defendants say that MEAC was not a part of ETSU and ETSU was not a corporation?] **TRUSTEE GOLDEN SAID EVERYTHING ETSU NEEDS IS SITTING ON THE TABLE AND FAILURE IS NOT AN OPTION." (Exhibit 12 to Doc. XX: Minutes of Meeting of ETSU Board of Trustee's Academic and Student Affairs Committee, 2/23/2018, Section X—Emphasis Added)**

Yes, defendant, Golden, was correct. Failure is not an option for ETSU/MEAC, the captive corporation being bossed by Ballad Health. The old adage—another wildlife metaphor—"What's sauce for the goose is sauce for the gander," can certainly be applied to the incestuous relationship between an institution of higher learning and a supposed non-profit corporation, which is now the 4th largest health care organization in the United States, with $1.5 billion in revenue. Meanwhile, as reported by Anita Wadhwani in the **Nashville TENNESSEEAN** on Sunday, June 23, 2019 in at least 2 articles, here are some of the examples of Ballad's deleterious effect on the region's healthcare: (a) Ballad is the only hospital option for over a million people in five states, an area the size of New Jersey; (b) Ballad shuttered ten outpatient surgical centers to force patients to undergo these procedures in Ballad-owned hospitals; (c) Ballad blocked an effort by Holston Medical Group to buy an outpatient surgical center in the Tri-Cities to serve patients; (d) Ballad downgraded an excellent NICU unit at Holston Valley Medical

21

Center in Kingsport; (e) As reported at an FTC meeting during the week of June 17, 2019, John Syer, Jr., Vice-President of Anthem/Blue Cross and Blue Shield-Virginia, said that Ballad's emergency room physicians do not participate in this most elementary of insurance plans (as Mr. Syer, Jr. told the FTC referring to Ballad, "Consumer choice, which is so important, that really doesn't exist in this geography."); (f) Ballad downgraded a Level I trauma center in Kingsport at Holston Valley Hospital; (g) travel times to emergency rooms and trauma centers for adults, pregnant mothers and babies have increased (according to Dr. Mickey Spivey, a former physician at the Holston Valley hospital ER, the risk of death increases by 25 percent if a patient is not receiving definitive care in a Level I trauma center in the first hour post-trauma, which is especially acute in rural areas, where 60 percent of all trauma deaths are rural trauma deaths); (h) southwest Virginia, in Ballad's market area, does not recognize the downgraded Level III trauma centers, which means that ambulances will have to speed along winding roads to Johnson City for an hour trip from, for example, Duffield, Virginia (where defendant, Keith Wilson, lives in a rural area); (i) the governing boards of Sullivan County, Tennessee and Scott County, Virginia, have passed resolutions of concern about Ballad, (j) Ballad has jacked prices up, according to patients, especially on a line item called "facility fees." **Wadhwani, Anita, ibid. and also in "'Bad care and bad experiences': Appalachian merger draws scrutiny at FTC meeting," both in** <u>Nashville</u> TENNESSEEAN, **June 23, 2019.**

In addition, a Ballad predecessor, Mountain States Health Alliance, in coordination with MEAC/ETSU, killed a private methadone clinic which would have served the area by opposing its certificate of need. **(See, Baker, Nathan, "Region's history not favorable to methadone clinics,"** <u>**Johnson City PRESS**</u>**, July 31, 2016; Baker, Nathan, "Mountain States sues to stop methadone clinic,** <u>**Johnson City PRESS**</u>**, February 9, 2016; "Court grants Mountain State's request to stop the sale of land to buyer who wanted to build methadone clinic**<u>**," WJHL-TV**</u>**, February 9, 2016, @ https://www.wjhl.com/news/court-grants-mountain-states-request-to-stop-the-sale-of-land-to-buyer-who-wanted-to-build-methadone-clinic/969065338)** Of course, Ballad started its own Overmountain Clinic after killing this clinic, which is the" only game in town," where, months after

22

opening, WJHL-TV reporter Nate Morabito found that the cost to patients was, on the average, 23% higher than expected. **(See, https://www.wjhl.com/news/overmountain-recovery-methadone-fee-23-higher-than-originally-planned_20180123092055554/933992980.)** Ballad and ETSU/MEAC also recently attempted to block the formation of the new Creekside Behavioral Health Hospital in Kingsport. Fortunately, The Octopus lost that fight......for now.

(Ballad CEO, defendant, Alan Levine, was quoted in a recent newspaper article as stating, "You don't want a trauma center on every corner and you don't want a NICU on every corner...." **Wadhwani, Anita: "Medical monopoly: An unusual hospital merger in Appalachia leaves residents with few options." Nashville TENNESSEEAN, June 23, 2019.** But one wonders whether the State of New Jersey—the size of Ballad's coverage area—has but one trauma center and one NICU: it is a fact that Ballad's market area has only one NICU).

Respectfully, your plaintiffs say, again, that they may be country, but they are not stupid. As residents of this area, they are suffering both imminent harm, and, in some cases, actual harm as a result of the antitrust violations of Ballad, which are facilitated by its interlocking directorate. The plausibility of the defalcations of Ballad and the individual defendants in their capacities as stated is, in reality, probable, as are the injuries sustained or to be sustained (and, remember, Section 8 provides relief for injuries to be sustained in the future that are not speculative, thus giving plaintiffs standing).

So plaintiffs aver that they have **Article III** standing and have proven injury. We now turn to the final topic, whether plaintiffs' claims are barred by the state-action immunity doctrine.

### 8. WHILE A COPA STATUTE EXISTS, THE STATE ACTION IMMUNITY DOCTRINE IN THIS CASE FALLS SHORT OF GIVING THESE DEFENDANTS SUCH IMMUNITY: Concededly, plaintiffs understand that this hurdle is the most difficult to jump, and, in preparation for jumping this hurdle, plaintiffs invite the Court to examine Tennessee's Hospital Cooperation Act of 1993, as amended by the General Assembly in that fateful year of 2015 **(TCA §§ 68-11-1301 through -1310, inclusive).**

Yet, as shall be shown to the Court, the state-action immunity doctrine is merely the "ink sac" from which the obfuscating ink of the Ballad Octopus flows. More succinctly stated, most respectfully, the state action immunity cry of the defendants is a tale, "…full of sound and fury, signifying nothing." **Shakespeare, W., "Macbeth," (Act V, Scene 5).**

The state-action immunity doctrine arose under the case of **Parker v. Brown, 317 U.S. 341, 63 S. Ct. 307, 87 L. Ed. 315 (1943).** This case shall not be discussed herein, other than to state that it was the progenitor for a wide body of law. Under that body of law, known as "**Parker** immunity," certain acts that would otherwise be violative of the antitrust laws are allowed. The immunity applies to the state when it exercises legislative authority in creating a regulation with anticompetitive effects, and to private actors, such as the defendants herein, when they act at the direction of the state after having done so. In modern times, the doctrine has been best elucidated by three cases: **California Retail Liquor Dealers Association v. Midcal Aluminum, 495 U.S. 97, 100 S. Ct. 937, 63 L. Ed 2d 233 (1980), North Carolina State Board of Dental Examiners vs. FTC, 135 S. Ct. 1101, 191 L. Ed 2d 35 (2015), and FTC vs. Phoebe Putney Health System, Inc., 568 U.S. 216, 133 S. Ct. 1003, 185 L. Ed. 2d 43 (2013).** A short discussion follows:

In **Midcal**, the Supreme Court established a two-prong test for determination of whether a state-created trade restraint will pass muster. First, the restraint must be one "clearly articulated and affirmatively expressed as state policy." Second, the policy must be "actively supervised" by the state itself. **Midcal, 445 U.S. at 105, 100 S. Ct. at 943,** quoting **City of Lafayette vs. Louisiana Power & Light, 435 U.S. 389, 410, 98 S. Ct. 1123, 1135, 55 L. Ed. 364 (1978).**

**North Carolina State Board of Dental Examiners'** importance to the case under consideration herein is not the primary holding of the case (that state agencies controlled by active market participants do not enjoy **Parker** immunity), but, rather, what was buried in the decision. Specifically, and on point with this case, Justice Kennedy wrote that state agencies (in this case, the Tennessee Department of Health, charged with overseeing the COPA) are not, just by their very character of being agencies of a sovereign, cloaked with immunity; rather, immunity for state agencies, **"(r)equires more**

24

**than a mere façade of state involvement, for it is necessary in light of Parker's rationale to ensure the States accept political accountability for anticompetitive conduct they permit and control."** **North Carolina State Board**, 135 S. Ct. at 1111, quoting **FTC vs. Ticor Title Insurance Co.**, 504 U.S. **621, 636, 112 S. Ct. 2169, 119 L. Ed. 2d 410 (1992).**

      The case that merits the most discussion is the **Phoebe Putney** case, a decision written by Justice Sotomayor, which reversed the decisions of the Middle District of Georgia and the 11th Circuit granting the defendants' motion to dismiss. In that case, pursuant to Georgia's Hospital Authorities Law, the Hospital Authority of Albany-Dougherty County, Georgia owned Memorial Hospital, one of two hospitals in the county. The Authority formed two private non-profit corporations to manage Memorial. Later, the Authority decided to purchase the other hospital in the county and lease it to a subsidiary of one of these two corporations. The FTC moved for an injunction, the defendant moved to dismiss, and the District Court granted the motion to dismiss and denied the injunction, a decision the Eleventh Circuit upheld, based upon the facts that the Authority had immunity, and that the anticompetitive nature of the deal was presumed and foreseeable (which is the law governing anticompetitive statutes passed by legislatures). **Phoebe Putney, see 133 S. Ct. at 1004-05.**

      To summarize Justice Sotomayor's opinion, the unanimous Court held that the clear articulation prong of **Midcal** must be approached from a practical manner; that when a state grants an entity a **general** power to act, it does so against the backdrop of Federal antitrust law; that a reasonable legislature's ability to predict an exercise of anticompetitive powers falls well short (i.e. is not the same as?) a clear articulation of affirmative state policy to displace state competition. **Phoebe Putney, 568 U.S.at 227-33, 133 S. Ct. at 1012-14.**

      Applying the law to the facts at hand, plaintiffs believe that the state-action immunity doctrine is inapplicable to the particular situation herein. First, Tennessee's Hospital Cooperation Act of 1993 does not address the situation in which a hospital has a wide variety of medical practices in competition with other medical practices and service lines within those practices. In the "olden days," hospitals were more repositories for the "really sick," whose physician staffs were largely independent

25

contractors. Ballad, however, in becoming the 4th largest medical corporation in the United States, is sending forth its own employee-physicians—whether employed at the hospitals or through various Ballad groups—to battle against smaller medical practices. This aspect is not addressed by the COPA Act, nor is it addressed by the COPA itself **(see Doc. 1, Exh. 1)** The COPA law only addresses cooperative agreements between hospitals, and is "cricket-like" silent regarding the anticompetitive effects of hospitals with active-agent/employee medical practices granted COPAs, on the one hand, against independent medical practices, on the other. For that reason alone, there is no "active state supervision," because, at least in the case described, there is no clearly articulated state policy in any statute in any volume of the Tennessee Code governing this situation.

Next, the COPA in question **(fully reprinted at Doc. 1, Exhibit 1)** speaks clearly as to the composition and duties of the Ballad Board **(see Doc 1, Exh. 1, pp. 30-31, § 4.04).** Primary among these is the duty of care each of the 11 directors owes to Ballad:

"(a) <u>Duty of Care</u>. Each member of the Board of the New Health System (i.e. Ballad) shall exercise the duties of care, loyalty and obedience to (Ballad) required by law. **(Ballad) shall establish strict fiduciary policies reflecting such duties, and all Board members shall adhere to such policies."**

Plaintiffs contend that the emphasized sentence above is one, of many, proverbial "smoking guns." For the State of Tennessee's Department of Health is not the one establishing the fiduciary guidelines for the Ballad Board members, **BUT RATHER BALLAD, ITSELF, IS ESTABLISHING ITS OWN RULES FOR HOW ITS OWN DIRECTORS—INCLUDING THREE WHO SIT ON A COMPETITOR'S BOARD—SERVE ON ITS BOARD.**

To meet the active supervision requirement to extend state action immunity to anticompetitive conduct of a private entity, the state supervisor must review the substance of the anticompetitive decision, must have veto power over same, and the people creating the rules, in effect, may not be the market participants. **North Carolina Board of Dental Examiners, 135 S. Ct. at 1116-17.** In this case, the Department of Health has absolutely <u>NO</u> supervisory authority over the composition of the Ballad Board, with the exception of the bone thrown ETSU by having the ETSU President on the

26

Board, which, *prima facie*, presents a clear conflict of interest, because how can the President serve the interests of ETSU if its interests are inimical with Ballad? No provision in the COPA Act, nor in the COPA itself, nor in the regulations addresses conflicts of interest among Board members, and, in fact, it. lets the Board set its own Rules for its own governance, **<u>WITHOUT STATE SUPERVISION.</u>**

As "proof in the pudding," the Court is directed to **<u>Exhibit 12</u>** to plaintiffs' response to defendants' motion to dismiss **(Doc. 37)**, which is page 64 of Ballad's first annual report, from February 1 through June 30, 2018. One of the few duties actually outlined for the Ballad Board **(Doc. 1, Exh. 1, pp. 30-31),** is that at least once a year, the Board is to participate in training activities designed to help them manage the corporation they direct.

But what is **<u>Exhibit 12</u>**? It is a page from the Ballad Annual Report for fiscal year 2018 showing the training the directors actually took: and it is blank! Is this Board a sham? Is it interlocking and passive, instead of active? Well, it certainly walks like a duck.......A representative of the Tennessee Department of Health, Jeff Ockerman, claimed to local activist, Dani Cook, that by "inadvertence", the report of Director Activities was not included in the report. **(<u>Exhibit 12</u>, plaintiff's response)** Yet, by going to the link listed to the cover sheet to **<u>Exhibit 12</u>**, one may readily ascertain that, as of June 26, 2019, there is still absolutely no report of director's activities or education. This, plaintiffs contend, show that the Ballad Board is a sham, and merely an empty vessel.

Third, the Department of Health, according to the COPA itself **(Doc. 1, Exh. 1, see COPA Exhibit H, p.2),** has the authority issue a fine to Ballad of between $250,000 and $1,000,000 for violations relative to defalcations, mismanagement, etc., regarding the Ballad Board. Yet with the passive Board set forth above, and few or no State regulations governing the Board's behavior itself, it is certainly plausible that the interlocking nature of the Board would pose conflicts between Ballad, on the one hand, and MEAC/ETSU, on the other hand, which the State has no power to fine. The harm may not have occurred yet, but remember in the discussion above, one need not show immediacy to invoke Section 8 of the Clayton Act.

Fourth, the very terms of the COPA agreement estop Ballad from **opposing, "...or otherwise challeng(ing) the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief in either case, consistent with (the terms of Section 9.08 of the COPA). (Doc. 1, Exh. 1, pp. 47-48).** Plaintiffs respectfully aver that Ballad assents to this forum, or any other appropriate forum, interpreting the COPA to ascertain whether it grants state action immunity, and not merely stating that just because the legislature intended to grant it, the issue is a given. While the General Assembly certainly had the sovereign right to inhibit competition, it only provided the framework for same, and the COPA is certainly subject to interpretation by this Court, which must be done through the normal litigation process, and not by merely hoping plaintiffs will go away by filing a motion to dismiss.

Fifth—and, admittedly, this may be a stretch—one of the creators of Ballad has a clear financial interest in the merger and this COPA: State Senator Rusty Crowe, whose business was contracted to various hospitals in this region, and who now provides the only such service (for which his business operates) to Ballad Hospitals. **See, articles in Nashville TENNESSEEAN, previously cited.** Defendants may counter with this argument:" He listed it on his ethics disclosures and was cleared of ethics violations." Yet, as defense counsel knows in our profession, we as attorneys should avoid even the appearance of impropriety. **(See Tenn. Sup. Ct. R. 8 in general).** Under the law cited in **North Carolina State Board of Dental Examiners**, plaintiffs aver that this also vitiates any state action immunity claim, even if Senator Crowe received "good conduct passes" from every country on the face of the Earth. He may be immune legislatively, but not from federal antitrust law. Plaintiffs cast no personal aspersions on Sen. Crowe, but they do bring the facts to the Court.

Sixth, and, again with regard to the ETSU Board of Trustees, it certainly seems that, from its behavior, the Board of Trustees is behaving as if it not only were a captive of Ballad, but also had a significant interest in what it could do for Ballad. **Exhibit 13 to plaintiffs' response (Doc. 37)** are the minutes of the April 27, 2018 ETSU Board of Trustees, as transcribed by Board Secretary, David

Linville.  On page 10 of the minutes, defendant, Noland, spoke the following regarding media and branding:

"Media and Branding—"Dr. Noland read from a story on media and branding that was featured in the Tri-Cities Business Journal in which the branding expert called ETSU a 'random liberal arts commuter school.' He (defendant, Noland) asked for help in cross-branding the institution, noting as an example that there is no cross branding in Ballad facilities **DESPITE ETSU'S SIGNIFICANT INVOLVEMENT *IN* THOSE HOSPITALS**."—**Exhibit 13, p. 10**, Emphasis Supplied

Now, haven't the defendants in this action been telling the plaintiffs and the Court that ETSU and Ballad are not interconnected?  Your plaintiffs may be country….but they are not dumb.

Seventh, on the same day, the Executive Committee of the ETSU Board met, which is comprised of defendants, Golden and Niswonger, and Linda Lattimer, the wife of Bill Greene, who was mentioned prominently earlier.  **Exhibit 14 to plaintiffs' response (Doc. 37**) consists of the Minutes of this Executive Committee meeting.

In this meeting, defendant, Golden, said something quite interesting, quoted herein:

"Trustee Golden brought to the attention of the president questions **regarding reimbursements with BALLAD HEALTH THAT INCLUDE ETSU AND BILLING CODE INCONSISTENCIES.  HE SUGGESTED THAT UNIVERSITY STAFF CONTACT BALLAD TO GATHER FURTHER INFORMATION AS IT BECOMES AVAILABLE."—Exhibit 14, p. 32 (as paginated on exhibit)**

**Is this not price-fixing?  For what other purpose would a joint board member of ETSU/MEAC and Ballad speak about "billing code inconsistencies" between the two and would "suggest that university staff contact Ballad to gather further information as it becomes available?**

"If ETSU (and they never refer to it as "MEAC") were not captive to Ballad, why would ETSU need to question Ballad regarding the reimbursements Ballad pays it, i.e. the crumbs that Oliver Twist ETSU receives from the Mr. Bumble of this region, Ballad Health **(See, Dickens, Charles, Oliver Twist, 1837)?**  Why is the University beholden to Ballad?  Why is defendant, Golden, bringing this up:  is he the "conduit" between ETSU and Ballad? And doesn't this smack of price-fixing?  These are legitimate questions.  Again, plaintiffs may be country, but they are not dumb.

Prior to concluding this Memorandum—if the lack of supervision by the Department of Health and the lack of clear articulation of a state policy governing merged hospitals with

29

employee/agent/independent contractor medical practices competing against independent medical practices offering the same lines of service has not already been clearly shown—plaintiffs present two glaring examples of the absolute lack of state supervision, and, in fact, what could be considered to be a conspiracy between the State, on the one hand, and Ballad, on the other hand.

The Court's attention is directed to **Exhibit 15** and **Exhibit 16** to plaintiffs' response to defendants' motion to dismiss **(Doc. 37)**. **Exhibit 15** is the Emergency Rule Filing with the Tennessee Department of Health relative to the instant COPA, executed for the Department by its Assistant General Counsel, Ms. Malaka Watson, Esq., on July 14, 2015.

Now, the Court's attention is directed to **Exhibit 16**. This was an earlier draft, upon information and belief, of the same document, **EDITED BY AMERIGROUP INSURANCE COMPANY!** This is unusual, because, although it goes on all the time in all legislatures, it is very rare that a special interest (an insurance group) would actually **IN THE WIDE OPEN AND ON THE RECORD, RE-WRITE A STATE AGENCY'S REGULATION!!!!!**

Here is just a sample of what the insurance company re-wrote for the Department:

- A provision that, if the COPA were ever terminated by state action, the statute of limitations for bringing a lawsuit would be tolled. This was removed by the insurance company
- A provision allowing the COPA holder to contract with any health plan, and giving it liberal grounds to so do. This was also removed by the insurance company.
- Certain caps on prices of services, also removed by the insurance company; and,
- **A PROHIBITION AGAINST THE TYING OF SALES ALSO REMOVED BY THE INSURANCE COMPANY'S WIDE-OPEN EDITING OF THE TENNESSEE DEPARTMENT OF HEALTH'S REGULATIONS!** (Exhibit 15, page 13)

This proves, without a shadow of doubt, that the state-action immunity defense is an absolute sham,

**BECAUSE AN ENTITY WITH A FINANCIAL INTEREST IN THE STRUCTURING AND SUCCESS OF THE COPA WROTE REGULATIONS THAT THE ENTIRE STAFF OF ATTORNEYS EMPLOYED BY THE TENNESSEE DEPARTMENT OF HEALTH AND THE ENTIRE STAFF EMPLOYED BY TENNESSEE ATTORNEY GENERAL, HERBERT SLATERY, FAILED TO WRITE, AND, MORE IMPORTANTLY, FAILED TO USE THEIR INHERENT STATE POWER TO PROTECT THIS STATE'S CITIZENS.**

But it is nice to know that special interests write our laws and regulations.

The final example pertains to interaction local activist, Dani Cook, has had with the staff of the Attorney General and the Department of Health: **Exhibit 17** to plaintiffs' response to defendants' motion to dismiss **(Doc. 37)** clearly shows this. Ms. Cook, has made a couple of requests, but not an inordinate amount, to Deputy Tennessee Attorney General, Janet Kleinfelter, Senior Counsel at the A.G.'s office.

On Sunday, June 16, 2019 at 6:24 p.m., EDT, Ms. Cook sent to Kleinfelter, Jeff Ockerman and a woman by the name of Judi Knecht a request pursuant to the Open Records Act for any and all documents pertaining to or on behalf of Ballad Health and its predecessors to the Tennessee Department of Health, from June 1, 2015 to June 16, 2019, not immunized from disclosure by law.

The following day, Ms. Cook received a response from Asst. Atty. General Kleinfelter, but it was not directed to her: instead it was directed to Department of Health employee, Jeff Ockerman. The response, erroneously sent to Ms. Cook at 8:57 a.m. on June 17 (and to which Ms. Cook replied to Ms. Kleinfelter a minute later, pointing out that she had sent her message to the wrong person) is quoted below:

"Jeff, We can discuss this when I get back from DC. Much of what she has requested is posted on the Dept's website—but I know that there is stuff that isn't. Bottom line is that we will send a response to Ms. Cook pointing out the information that is publicly posted **AND WITH RESPECT TO THE REST—WE WILL PROVIDE IN ROLLING INSTALLMENS AND THAT SHE WILL HAVE TO PAY FOR IN ADVANCE BEFORE RECEIVING ANYTHING.**" –See **Exhibit 17.**

This Honorable Court should see why, if it believes nothing else posited in this Memorandum and filed with plaintiffs' response, plaintiffs believe their claim for relief is certainly plausible. The Attorney General's office of the State of Tennessee is working hand in hand with the Department of Health to hinder and delay a citizen of this State from gaining access to records which are public. Why would Kleinfelter and Ockerman be corresponding over a simple request for materials relative to the COPA? This, above all, proves no satisfactory state supervision, and proves what plaintiffs said the issue of state action immunity was in this case: a red herring.

**SUMMARY:** This Octopus walks like a duck and quacks like a duck, and, therefore, it is a duck. ETSU, by state statute and the way it conducts business, is a corporation in fact and in law. MEAC's business is definitely ETSU's business as it derives its existence from ETSU, and, thus, is ETSU's subsidiary. MEAC, and, by reference, ETSU, compete directly with Ballad Health to provide medical services for a geographic region the size of the state of New Jersey, encompassing five states with over one million residents, including your plaintiffs. According to the rules of pleading in the Federal Rules of Civil Procedure, plaintiffs adequately pled what the relevant market was, what the nature of the competitive services were, as well as that the corporate defendants met the Clayton Act's financial requirements. Even if the defendants still maintain that plaintiffs did not adequately plead these requisites, the defendants are absolutely estopped from holding otherwise, because their publicity materials, including their website, and also the materials Ballad submitted to the Tennessee Department of Health, prove otherwise.

Moreover, plaintiffs have standing to bring this lawsuit, they have alleged antitrust injury, and they have complied with **Article III of the U.S. Constitution**. The uniqueness of proof of an interlocking directorate case allows plaintiffs, in a rare departure from **Spokeo**, to prove imminent and future harm, not actual and concrete harm. Plaintiffs have certainly proven injuries; in fact, their very case was made by, among others, the newspaper of record in this State, the Nashville **Tennesseean,** on June 23, 2019, as referenced by the articles cited herein. Finally, the third prong of **Spokeo** is satisfied in that this Court certainly may redress the harm sustained by plaintiffs.

The antitrust injury plaintiffs have alleged is *ipso facto* (as allowed by law) an interlocking directorate between two corporations who are competitors. As shown by the multitude of exhibits attached and incorporated into plaintiffs' response, this interlocking directorate has already begun to hold ETSU/MEAC captive to the Ballad Octopus; re-recitation to the citations above is not necessary.

Finally, the state-action immunity doctrine, as concerns this situation, is clearly a red herring because (a) the COPA Act itself does not govern the alleged antitrust violations in this situation (an interlocking directorate between two entities, one of which happens to be a hospital, that provide

32

medical services through the doctors they employ; the COPA only covers mergers between two hospitals); (b) the Ballad Board of Directors, and not the Department of Health (the supposed supervisor of the COPA) establishes its own rules for its Board members; (c) although the Department of Health has the ability to issue civil penalties as a result of misfeasance or malfeasance by the Ballad Board or its individual directors, the Ballad Board, which sets its own rules, acts, in essence, as policeman, judge and jury of itself; (d) the COPA itself requires Ballad to assent to any proper judicial forum, including this forum, to address grievances, thus taking the COPA out of state action immunity; (e) a local legislator who, basically, steered the COPA through the General Assembly has a deep conflict of interest and, in essence, created the monster which, under the doctrine of **North Carolina State Board of Dental Examiners**, vitiates the COPA; (f) the administrative rules governing the Department of Health's oversight of the COPA were written in part by the insurance lobby, showing yet another violation of the doctrine of **North Carolina State Board,** and (g) this State's own Attorney General's office is acting in concert with the Tennessee Department of Health, the department supposedly looking out for the welfare of the citizens of the State of Tennessee living in the Ballad market area, to hinder, if not illegally deny, the citizens of this State from receiving the unprivileged, unexempt public records regarding this Monster to which the Tennessee Open Records Act says the citizens are entitled.

As a result, there is no clearly articulated state policy governing anticompetitive actions between a large conglomerate that hires and markets its own physicians and specialists (Ballad Health Urgent Care, for example) and a smaller independent entity that is attempting to make a living and keep its place in a market that has been monopolized (e.g. ETSU/MEAC and Holston Medical Group); further, there is certainly no active state supervision when the Department of Health lets the insurance lobby write its regulations, and acts in concert with the Attorney General's office to violate the Tennessee Open Records Act. This lack of competition defeats the financial interest of the common folk of this judicial district, such as plaintiffs.

Thus, plaintiffs claim seeking relief from an interlocking directorate must stand.

33

CHRISTINE BEARDEN, ET AL

S/Francis X. Santore, Jr.
Francis X. Santore, Jr., BPR #011315
Of Counsel

SANTORE AND SANTORE
Attorneys at Law
P. O. Box 113
Greeneville, TN   37744-0113
423-639-3511
423-639-0394 (fax)
franksantore@comcast.net

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on **June 28, 2019**, a copy of the foregoing **Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss** was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

S/Francis X. Santore, Jr.