| | |
|---|---|
| CHRISTINE BEARDEN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>BALLAD HEALTH, et al.,<br><br>    Defendants. | Case No. 2:19-cv-00055<br>Hon. Curtis L. Collier |

**DEFENDANTS BALLAD HEALTH AND THE INDIVIDUAL BALLAD HEALTH DIRECTORS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

Defendant Ballad Health and the individual Ballad Health Directors ("Defendants") submit this reply in support of their motion to dismiss (the "Reply").

**I.  Introduction**

In Plaintiffs' Opposition to Defendants' Motion to Dismiss (the "Opposition"), Plaintiffs tacitly admit that their complaint is deficient because they needed most of their 25 pages to discuss 200 plus pages of new exhibits and other new information not contained in the pleadings to explain why their complaint should not be dismissed. Setting aside that all of their extraneous "factual enhancements" are improper and that the Court should not consider them in this motion to dismiss briefing,[1] even if the Court did consider all the new material added, Plaintiffs'

---

[1] As discussed in Defendants' Motion to Strike, filed concurrently with this Reply, Plaintiffs attached 17 new exhibits to their Opposition and rely on them extensively in their brief, as they do several news articles. None of these new exhibits or materials are "referred to in [their] complaint [or] central to the[ir] claim" and they should all be stricken. *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001); *Knowles v. Chase Home Finance, LLC*, No. 1:11-cv-01051, 2012 WL 13018539, at *9 (W.D. Tenn. Aug. 2, 2012) (explaining that plaintiffs may not "submit matters outside the pleadings . . . to defeat a motion to dismiss").

complaint and their Opposition combined are wholly inadequate to state a claim entitling them to relief under Clayton Act Section 8.

The baseless nature of their claims is revealed by their attempt to amend the complaint through their Opposition. They have no claim against the eight Ballad directors who do not serve on multiple boards and no claim against defendants Niswonger and Golden who serve on the board of ETSU, which is not subject to suit under Section 8. Those claims have no merit, which the Opposition only highlights. Nor can these Plaintiffs explain what it is about Defendant Noland's service on the Ballad Health and MEAC boards that is imminently causing harm to any of these specific Plaintiffs to establish Article III standing under the Constitution or show antitrust injury and standing to sue under the antitrust laws. Plaintiffs cannot remedy the flaws of their pleadings—they simply do not have a case to plead. Moreover, they fail to disprove the clear applicability of antitrust immunity to the alleged antitrust violation. The complaint should be dismissed with prejudice.

## II.     Eight Directors Must Be Dismissed.

Plaintiffs sued eight Ballad directors (defendants Allen, Bennett, Lester, Levine, May, Peacock, Springer and Wilson) (the "Eight Directors") based on pure speculation, dubbed "information and belief," that "there is reasonable basis for concern that more such prohibited interlocking directorates exist." Doc. 1, Page ID #5 (¶ 13). Speculation is not enough to survive a motion to dismiss under Supreme Court precedent. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (mere suspicion of a legally cognizable right of action is not enough to survive a motion to dismiss). Plaintiffs do not defend their original pleading but instead allege a new, also insufficient, theory for why the Eight Directors are members of this lawsuit: that they "allowed 3 of their own members to" serve on other boards. Doc. 50, Page ID #1879. Section 8 of the Clayton Act, Plaintiffs' sole claim in this case, however, has no provision for liability for

board members who "allow" members to serve on other boards. *Cheatom v. Quicken Loans*, 587 F. App'x 276, 283 (6th Cir. 2014) (dismissal proper where no allegations of any alleged illegal conduct exist).

Plaintiffs now have had two bites at the apple with respect to implicating the Eight Directors in this case, but to no avail. Plaintiffs do not have a case against them because they do not sit on multiple boards and have not engaged in any actionable conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). Amending Plaintiffs' allegations against the Eight Directors for a third time is futile and should not be allowed. Plaintiffs' claim against the Eight Directors should be dismissed with prejudice and the Eight Directors should be removed from the caption of this case. *See Burkeen v. A.R.E. Accessories, LLC*, 758 F. App'x 412, 416 (6th Cir. 2018) (explaining that dismissal with prejudice is proper where complaint cannot be saved by amendment); *see also Twombly,* 550 U.S. at 559 ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." (quoting, in a parenthetical, *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1001, 1006 (7th Cir. 1984)).

### III.    ETSU Is Not a Corporation.

In their complaint, Plaintiffs name Golden and Niswonger as defendants and allegedly interlocking directors and allege that ETSU is MEAC's "corporate parent." Doc. 1, Page ID #2. But ETSU is not a corporation,[2] and Section 8 of the Clayton Act applies only to directors who

---

[2] ETSU is not a corporation; it is a state-chartered educational institution established by Tennessee legislation. Tenn. Code Ann. § 49-8-101 ("There is established a state university and community college system . . . ."). Moreover, a corporation does not exist in Tennessee until "the charter is filed by the secretary of state." *Id.* § 48-12-103(a) (for-profit corporations); *id.* §

serve on the boards of two corporations. 15 U.S.C. § 19 ("No person shall, at the same time, serve as a director or officer in any two corporations . . . ."); *Bankamerica Corp. v. United States*, 462 U.S. 122, 128 (1983) ("interlocked corporations must all be corporations . . . ."). Plaintiffs do not and cannot state a cause of action against Defendants Golden and Niswonger, and the claims against Golden and Niswonger should be dismissed with prejudice. *See Burkeen*, 758 F. App'x at 416 (dismissal with prejudice is proper where amendment will not salvage complaint).

Plaintiffs make no attempt to defend their complaint, admitting that ETSU might not be a corporation *de jure*, and instead use their Opposition to try to manufacture ETSU into a *de facto* corporation to subject Golden and Niswonger to suit under Section 8. However, Tennessee has not recognized the doctrine of *de facto* corporations for over fifty years. *See Evans v. Holland*, No. 88-351-11, 1989 WL 25602, at *3-4 (Tenn. Ct. App. Mar. 22, 1989), *permission to appeal denied* (Tenn. 1989); *Thompson & Green Machinery Co. v. Music City Lumber Co*., 683 S.W.2d 340, 344-45 (Tenn. Ct. App. 1984) (holding that the doctrines of *de facto* corporation and corporation by estoppel met their "demise" when the Tennessee legislature enacted the Tennessee General Corporations Act of 1968). Plaintiffs' tortured argument provides no legal or factual support for finding that ETSU somehow is transformed into a corporation by virtue of the *University of Tennessee* (an entirely different entity created by an entirely different statute)[3] allegedly being a "body politic and corporate." The same is true about the assertions that *ETSU*

---

48-52-103(a) (nonprofit corporations). Filing a corporate charter is "conclusive proof that the incorporators satisfied all conditions precedent to incorporation." *Id*. § 48-12-103(b); *id.* § 48-52-103(b). ETSU has not filed a corporate charter with the secretary of state and is not a corporation. *See Business Information Search*, TENN. SECRETARY OF STATE, https://www.tnbear.tn.gov/Ecommerce/FilingSearch.aspx (last visited July 18, 2019) (producing no results for "ETSU" or "East Tennessee State University" and stating that "[a]s of July 17, 2019 we have processed all corporate filings received in our office through July 17, 2019.").

[3] *Compare* Tenn Code Ann § 49-8-101 (creating ETSU), *with id.* § 49-7-206 (creating the University of Tennessee).

*Foundation* and *ETSU Research Foundation* are corporations (even if they were established as corporations by the same board of regents that governs ETSU) and that *MEAC d/b/a ETSU Physicians* and *ETSU Health* allegedly are corporations. ETSU simply is not a corporation.

Plaintiffs' claim that ETSU becomes a corporation because MEAC's corporate status somehow is imputed to ETSU as an alleged subsidiary has no merit. First, MEAC is not ETSU's subsidiary. That is demonstrably false as MEAC has certified to this Court that it has no corporate parent. Doc. 33. Second, Plaintiffs conflate antitrust case law governing whether two entities are wholly owned and incapable of conspiring under the Sherman Act with Clayton Act Section 8's applicability to corporations *only*. *See* Doc. 50, Page ID #1867-69. And in any event, ETSU does not wholly own MEAC.

Clayton Act Section 8 does not apply to Golden and Niswonger because ETSU is not a corporation, so the Court should dismiss this case against them with prejudice. *See Twombly*, 550 U.S. at 557-58 (explaining that Fed. R. Civ. P. 8 requires a short and plain statement of an entitlement to relief "lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'") (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)); *Burkeen*, 758 F. App'x at 416 (explaining that dismissal with prejudice and without leave to amend is appropriate if the complaint cannot be saved by an amendment).

## IV. Plaintiffs Have Not Alleged Article III Standing.

In their Motion to Dismiss, Defendants explained that Plaintiffs have not alleged any theory of injury, let alone an imminent or certainly impending theory of injury, as the Constitution requires in an injunction case like this one. Nor have they identified how any harm could affect these Plaintiffs, identified only as "interested members of the community," in any

5

Case 2:19-cv-00055-CLC-CRW   Document 52   Filed 07/18/19   Page 5 of 18   PageID #: 1907

"personal and individual way." Doc. 28, Page ID #549-50; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 & n.1 (1992).

Plaintiffs respond with three principal arguments: (1) that the Constitution and Supreme Court precedent do not apply to them; (2) that newly submitted news articles and ETSU Board minutes unconnected to Plaintiffs or any interlock show injury; and (3) that as "interested members of the community," they were injured as "consumers of health care services in Ballad's market area." Doc. 50, Page ID #1878-79. None of these arguments survives scrutiny.

### A. Article III's Standing Requirements Unquestionably Apply to Plaintiffs.

Plaintiffs argue that their need "to prove actual, concrete particularized, imminent harm,"[4] i.e., injury in fact, as the Constitution and Supreme Court require, has been "obviate[ed]" even though that "may be an aberration of the first prong of the three-prong test of *Spokeo, Inc. v. Robins*." *Id.* at Page ID #1878. They make this claim on the mistaken ground that Section 8 is "remedial" and "preventative in nature," requiring claimants only to "make out a *prima facie* case for relief." *Id*. The Constitution requires all plaintiffs, regardless of the nature of their case, to establish Article III standing *before* a federal court will have jurisdiction to hear the case. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016). "[I]njury in fact is a constitutional requirement, and it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Id.* at

---

[4] Plaintiffs falsely state Defendants contend they must plead only actual harm. They argue that Section 8, "unlike what defendants are attempting to tell the Court," attempts "to ameliorate what can occur in the future" and the "'injury in fact' under the Clayton Act contemplated by *Spokeo*, which is 'actual, concrete, particularized, *de facto*, actually existing' is the imminent, future threat of harm by violation of antitrust law, and not the actual harm at the moment." Doc. 50, Page ID #1878-79. Defendants' Motion states that standard: "A *threatened* alleged injury, to constitute injury in fact, must be '*certainly impending*.' This is a point the Supreme Court has 'repeatedly iterated.' 'Allegations of *possible* future injury are not sufficient.'" Doc. 28, Page ID #547-48 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

6
Case 2:19-cv-00055-CLC-CRW   Document 52   Filed 07/18/19   Page 6 of 18   PageID #: 1908

1547-48 (alteration in original) (internal quotation marks omitted).  Arguing that pleading a *prima facie* Clayton Act Section 8 case obviates their need to plead injury in fact, Plaintiffs concede they did not plead it, which strips this Court of jurisdiction to hear their case.  *See id*.

In addition, none of the cases Plaintiffs cite actually support their theory that Section 8 "must be construed liberally" and that they do not need to plead concrete, particularized injury for Article III standing.  All of their cases pre-date *Twombly*, *Iqbal*, and *Spokeo* by decades, none involve motion-to-dismiss stage questions of whether plaintiffs had standing, and several do not even involve Section 8.  For example, *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974), and *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966), involved mergers under Section 7.  Further, *United States v. Crocker National Corp.*, a Section 8 case Plaintiffs cite as a "good case in point," was overturned by the Supreme Court and is not good law.  656 F.2d 428, *rev'd sub nom. Bankamerica Corp.*, 462 U.S. 122.  Plaintiffs' other two cases, *TRW, Inc. v. FTC* and *Cia. Petrolera Caribe v. Arco Caribbean, Inc.*, do not stand for the proposition that Section 8 should be "liberally construed" to permit claims that do not satisfy Article III, as they contend. *See Cia. Petrolera Caribe*, 754 F.2d 404 (1st Cir. 1985) (reversing grant of summary judgment on Section 8 claim because there were genuine issues of material fact about whether an unlawful interlocking directorate existed); *TRW, Inc.*, 647 F.2d 942, 945-47 & n.3 (9th Cir. 1981) (explaining that "[s]tatutory language should be construed in accordance with its underlying purpose," which, in the case of Section 8, includes three statutory "preconditions to . . . the bar against interlocking directorates").  Plaintiffs' argument that they do not need to satisfy Article III's standing requirement has no merit.

B.  **Plaintiffs' Allegations of Possible Future Harm Do Not Satisfy Article III's "Injury" Requirement.**

Plaintiffs argue under their invalid injury standard that they "will probably suffer harm" based on new evidence that is not part of the pleadings. Doc. 50, Page ID #1879. "Allegations of possible future injury are not sufficient" to establish Article III standing, *see Clapper*, 568 U.S. at 409, and further, the new evidence does not show imminent injury to these Plaintiffs from an alleged interlock. For example, Plaintiffs rely on Exhibit 11, which is a set of ETSU Board of Trustees' minutes dated November 10, 2017, and two news articles from the *Johnson City Press* dated February 9, 2016 and July 31, 2016—all three of which *precede* the merger of Mountain States Health Alliance and Wellmont Health System and cannot constitute injury imminently caused by the interlock. *See* Doc. 50, Page ID #1879-80, 1882; *see also Clapper*, 568 U.S. at 409 (indicating the Supreme Court has "repeatedly reiterated" that standing only exists where injury that has not yet occurred is "*certainly* impending").

Plaintiffs also heavily rely on reports of Ballad Health market activities in two articles published in *The Tennessean* on June 23, 2019. Doc. 50, Page ID #1881-82. The articles cannot form the basis for injury in the complaint, which was filed on April 4, 2019, because the articles were unwritten at that time. Even if the reported activities could constitute some kind of injury, there is no allegation that the purported interlock played any role in them or that the activities affected these Plaintiffs in any way. Similarly, Plaintiffs rely on ETSU minutes from the Student Affairs Committee that discuss research collaborations between ETSU, an educational institution, and Ballad Health, as well as the importance of MEAC finding the right CEO. Doc. 50, Page ID #1880-81; Doc. 49-15 (Exh. 12). Plaintiffs do not explain how the interlock affects ETSU's potential research collaboration with Ballad or MEAC's CEO selection process or how either event conceivably is imminently harmful to them.

### C. Plaintiffs Failed To and Cannot Plead Particularized Injuries.

Plaintiffs' new assertions that they are "residents of this area [who] are suffering both imminent harm, and, in some cases, actual harm as a result of the antitrust violations of Ballad, which are facilitated by its interlocking directorate," and that they are a subset of "all of the other persons in this area" who "suffer" while MEAC and Ballad form a relationship are also insufficient as allegations of injury in fact. Doc. 50, Page ID #1881-82. Plaintiffs do not explain which, if any, of the events in the news articles and meeting minutes attached to their Opposition affects which Plaintiff specifically or how that event affects that Plaintiff. Nor do they explain what it is about the interlock that caused any of the events about which they complain. In sum, Plaintiffs do not allege that any "particularized" injury will "affect the[m] in a personal and individual way" such that they will suffer some "imminent" injury, which is required to establish Article III standing. *Lujan*, 504 U.S. at 560-61 & n.1.

The three elements of Article III standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Id.* at 561. Plaintiffs spent two dozen pages of their Opposition alleging "factual enhancements" to their complaint (*see* Doc. 50, Page ID #1873), but they did not plead injury in fact or remedy their failure to plead facts that allow the Court to trace any alleged injury from the alleged interlock to Plaintiffs. Even in combination with the "factual enhancements," the complaint still does not explain how the relief Plaintiffs seek would redress any alleged imminent injury. *See Lujan*, 504 U.S. at 571 (rejecting "entirely conjectural" redressability theory). Plaintiffs' second failed attempt to plead that they face imminent injury confirms that amending the complaint is futile. Plaintiffs cannot plead imminent injury, cannot establish Article III standing, and do not have a justiciable controversy, and the case should be dismissed with prejudice. *See Twombly*, 550 U.S. at 558 ("So, when the

9
Case 2:19-cv-00055-CLC-CRW   Document 52   Filed 07/18/19   Page 9 of 18   PageID #: 1911

allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." (internal quotation marks omitted)); *Burkeen*, 758 F. App'x at 416 (explaining that a complaint that cannot be saved by amendment should be dismissed with prejudice)).

## V. Plaintiffs Did Not Plead Antitrust Injury.

Plaintiffs do not attempt to remedy the complaint's failure to plead antitrust injury; the subject is unaddressed in their Opposition. Antitrust injury is a prerequisite to pleading an antitrust case, even under a per se statute. *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 402 (6th Cir. 1997). Plaintiffs cannot show that any alleged violation of Section 8 was "a necessary predicate to [their] loss" because Plaintiffs cannot explain what their imminent loss is. *Id.* at 404 (internal quotation marks omitted). Accordingly, no antitrust injury exists and the case should be dismissed with prejudice. *See Twombly*, 550 U.S. at 557-58; *Burkeen*, 758 F. App'x at 416.

## VI. Ballad Is Immune to This Lawsuit.

The Court should dismiss the complaint because its Section 8 claims meet the two-pronged test for antitrust immunity in *California Retail Liquor Dealers Association v. Midcal Aluminum Inc.* ("*Midcal*"), which provides that challenged restraints must be "clearly articulated and affirmatively expressed as state policy" and the policy must be "actively supervised" by the state. 445 U.S. 97, 105 (1980) (internal quotation marks omitted). The complaint challenges the application of *Midcal*'s prong two, but the Opposition raises—for the first time—Plaintiffs' claim that the alleged interlocks do not meet prong one. (Doc. 50, Page ID #1884). Plaintiffs' arguments fail as to both prongs of the *Midcal* test.

***Clear Articulation***. "To pass the 'clear articulation' test," a state legislature need not "expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." *Hallie v. Eau Claire*, 471 U.S. 34, 43-44 (1985). Requiring state legislatures explicitly to authorize specific anticompetitive effects before state-action immunity could apply would "embod[y] an unrealistic view of how legislatures work and of how statutes are written." *Id.* at 43. The test requires only that the anticompetitive effect be "foreseeable." *Id.* at 42. The Supreme Court has found clear articulation even where the relevant statute did not explicitly permit anticompetitive activity. *Columbia v. Omni Outdoor Advert.*, 499 U.S. 365, 373 (1991).

The COPA Act not only meets but also exceeds these standards. It explicitly provides that "[i]t is the policy of this state, in certain instances, to displace competition among hospitals with regulation . . . and to actively supervise that regulation . . . and to *provide state action immunity from federal and state antitrust law to the fullest extent possible to those hospitals*." Tenn. Code Ann. § 68-11-1303(a) (emphasis added); *see* (Doc. 28, Page ID #559-60).

Tellingly, Plaintiffs do not *mention* the statute's words when arguing what those words supposedly mean. They argue a point of statutory interpretation by studiously avoiding what the statute actually says. Their sole ground for claiming that the COPA Act—despite its unambiguous text to the contrary—does not clearly articulate a policy that immunizes the alleged interlocks is that the Act became law in the "olden days" when physicians were "largely independent contractors" and not hospital employees. (Doc. 50, Page ID #1884). They contend that the Act "does not address the situation" of competition between hospital "employee-physicians" and independent physicians. *Id.* This argument fails, without even accounting for its wholly speculative and unsubstantiated underpinnings.

11

To establish antitrust immunity, the only "situation" for which a statute must clearly articulate a policy to displace competition is the alleged anticompetitive *conduct* at issue. *See Midcal*, 445 U.S. at 105 (explaining that "*the challenged restraint*" must be clearly articulated and affirmatively expressed as state policy (emphasis added)). The challenged restraints in this case are the alleged interlocking directorates in violation of Section 8. Plaintiffs do not argue that Section 8 is beyond the scope of the COPA Act's grant of "immunity from federal . . . antitrust law." Their detour into "olden days" and irrelevant physician ownership structures is a transparent attempt to deflect attention from the Act's clearly articulated statutory language.[5]

Plaintiffs further weaken their credibility by ignoring the COPA Act's focus on physician competition with hospitals, i.e., that which Plaintiffs say the COPA Act does not do. The Act requires the Department of Health, when considering a COPA application, to evaluate the potential disadvantages from issuing a COPA, including "[t]he extent of any reduction in competition among physicians, allied health professionals, other healthcare providers, or other persons furnishing goods or services to, or in competition with, hospitals that is likely to result directly or indirectly from the cooperative agreement." Tenn. Code Ann. § 68-11-1303(e)(3)(B).

On its face, the statute's requirement that the Department of Health evaluate the "extent of any reduction in competition among physicians . . . in competition with[] hospitals" is fatal to Plaintiffs' argument that the Act "does not address" competition between independent and hospital-employed physicians. Moreover, Section 5.05 ("Physician Services") of the Department's Terms of Certification governing the COPA, which Plaintiffs attached to the

---

[5] Tennessee substantively amended the COPA Act in 2015. 2015 Tenn. Legis. Serv. ch. 464 (West 2015). Therefore, Plaintiffs' musings about the Act's "olden days" influences are not only irrelevant to the legal issues but also factually erroneous. One of the amendments to the Act in 2015 was the provision quoted above stating that COPA recipients have antitrust immunity "to the fullest extent possible." *Id.*; *see* Tenn. Code Ann. § 68-11-1303(a).

complaint, sets forth the Department's supervisory rules regarding physician competition. *See* (Doc. 1, Page ID #3-4 (¶ 6); Doc. 1-1 (Pls.' Exh. A)), Page ID #46-47 (§ 5.05).

**Active Supervision.** To meet *Midcal's* prong two, "[a]ctive supervision need not entail day-to-day involvement in the [immunized party's] operations or micromanagement of its every decision." *N.C. State Bd. of Dental Examiners v. FTC*, 135 S. Ct. 1101, 1116 (2015) ("*NCSB*"). "Rather, the question is whether the State's review mechanisms provide 'realistic assurance' that a nonsovereign actor's *anticompetitive conduct* promotes state policy, rather than merely the party's individual interests." *Id*. (emphasis added) (internal quotation marks omitted). Only anticompetitive activity violates the antitrust laws, so for immunity to apply under Court doctrine, the state must only ensure *that* activity complies with the state's policy displacing competition with regulation. "The Court has identified only a few constant requirements of active supervision." *Id.* They are:

> The supervisor must review the substance of the *anticompetitive* decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the mere potential for state supervision is not an adequate substitute for a decision by the State. Further, the state supervisor may not itself be an active market participant. In general, however, the adequacy of supervision otherwise will depend on all the circumstances of a case.

*Id.* at 1116-17 (emphasis added). Plaintiffs are either unaware of, or choose to ignore, these principles.

To start, Plaintiffs argue the Department "has absolutely NO supervisory authority over the composition of the Ballad Board, *with the exception of . . . having the ETSU President on the Board*." (Doc. 50, Page ID #1885) (emphasis added). Plaintiffs thus <u>admit, as they must,</u> that the Department's authority *extends to the interlock at issue in this case*. (The ETSU President, Defendant Noland, also serves on Defendant MEAC's Board.) On that ground alone, this Court should dismiss this case with prejudice.

13

The remainder of the Opposition argues, with references to materials not contained in the complaint, that Ballad Health does not receive active state supervision. (Doc. 50, Page ID #1885-89). Their claims are replete with speculation and ad hoc grievances over alleged acts that are not harms from interlocking directorates, not anticompetitive, and not failures of state supervision.

For instance, Plaintiffs call a Department requirement that Ballad Health establish and write fiduciary Board policies, instead of the Department writing the policies itself, a "smoking gun." *See* (*id.* at Page ID #1885. These are quintessential operations or micromanagement activities and of the type the Supreme Court has expressly stated do not require active supervision. *See NCBD*, 135 S. Ct. at 1116. Similarly, Plaintiffs allege that the Ballad Board did not take part in training activities (Doc. 50, Page ID #1886) and that a Ballad Health "creator" "has a clear financial interest in the merger and this COPA" (*id.* at Page ID #1887). The drafting of fiduciary policies, training activities and a "creator's" operations of his own company are not anticompetitive and have no alleged connection to an interlocking directorate.

Plaintiffs refer to public ETSU board minutes concerning "Media and Branding" that discuss "ETSU's significant involvement" in Ballad Health hospitals, apparently to allege that the ETSU is "a captive of Ballad" with a "significant interest in what it could do for Ballad." *Id*. Cross-branding between a neighboring university and health system is not anticompetitive. Also, Plaintiffs refer to public ETSU board minutes and engage in innuendo concerning a statement about "billing code inconsistencies" by asking "is this not price-fixing." (*Id*. at Page ID #1887-88). Plaintiffs clearly recognize it is not, because there is no such allegation in the complaint and

14

they do no more than ask a series of rhetorical questions in the Opposition. These are further examples of Plaintiffs resorting to irrelevant and extraneous information.[6]

None of Plaintiffs' proffered new evidence adequately pleads that state action immunity does not apply here, and the motion to dismiss should be granted with prejudice.

**VII.  Plaintiffs Fail To Identify a Relevant Market.**

As detailed in the Motion, Section 8 cases require the pleading of a relevant geographic and product (service) market, because that is the lens through which courts determine whether corporations are competitors, as required by the statute. (Doc. 28, Page ID #557). The relevant market also is important to other aspects of the case. Antitrust injury requires injury that flows from the relevant market. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977). Section 8 itself provides for three safe harbors, all of which depend on a calculation of *competitive* sales of either corporation at issue. *See* 15 U.S.C. § 19(2)(A)-(C) ("For purposes of this paragraph, 'competitive sales' means the gross revenues for all products and services sold by one corporation in competition with the other.").

Plaintiffs' complaint alleges only a market for "medical and allied health services." (Doc. 1, Page ID #4) (¶ 9). This is not a proper relevant market. Physicians compete in narrowly defined service lines consisting of their specialty. Defendants identified this deficiency in the meet-and-confer but Plaintiffs did not timely amend their complaint. *See* (Doc. 29) (Defs.' Notice of Cert. of Compliance). Plaintiffs now try to blame Defendants for having to scroll

---

[6] Plaintiffs assert other baseless claims. One is that the Department lacks antitrust immunity. (Doc. 50, Page ID #1883-84). The Department is not a defendant or party to an interlocking directorate and its qualifications for immunity from a hypothetical antitrust suit are irrelevant. Two others allege that an insurance company drafted portions of Department's regulations and that the Department delayed someone's records request. (*Id*. at Page ID #1888-90). These have nothing to do with interlocking directorates or Ballad Health's antitrust immunity. A fourth speculates about "harm [that] may not have occurred yet" from the Ballad Health/MEAC interlock. (*Id*(at Page ID #1886). Speculation cannot form the basis of a complaint.

through website lists to determine the service lines in which MEAC and Ballad Health provide services generally (*see* Doc. 50, Page ID #1870-75), but at no point did Defendants represent that they do not compete with MEAC. The basis of the meet-and-confer discussion and Defendants' Motion on this issue was to determine the relevant markets *at issue in this case*.

Plaintiffs now aver that MEAC and Ballad provide at least five service lines in common and may compete in additional services such as sports medicine, geriatrics and psychiatry. (*Id.* at Page ID #1874-75). They make no allegations about the MEAC service areas. Plaintiffs still have not pled "a short and plain statement" of the relevant market "showing the pleader is entitled to relief," *see* Fed. R. Civ. P. 8, but it seems Plaintiffs contend that every common service line between Ballad Health and MEAC in every service's geographic market may be implicated. Based on the other deficient pleading issues in this case, these ten Plaintiffs are unlikely to be able to plead injury in each of those markets.

## VIII. Conclusion

For the foregoing reasons, Defendants respectfully request this Court grant its Motion to Dismiss with prejudice.

Dated: July 18, 2019 Respectfully Submitted,

**HUNTER, SMITH & DAVIS, LLP**

/s/ Jimmie C. Miller
Jimmie C. Miller
BPR No. 009756
P. O. Box 3740
Kingsport, TN 37664
(423) 378-8852
jmiller@hsdlaw.com

**McDERMOTT WILL & EMERY LLP**

Jeffrey W. Brennan (admitted *pro hac vice*)
Michelle Lowery (admitted *pro hac vice*)
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8127
jbrennan@mwe.com
mslowery@mwe.com

*Attorneys for Defendants Ballad Health and all the individual Defendants in their capacities as members of the Board of Directors of Ballad Health*

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 18th day of July, 2019, a copy of the foregoing **Reply to Motion to Dismiss** was filed electronically using the Court's ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

                                        /s/ Jimmie C. Miller
                                        Jimmie C. Miller